STATE ex Rel. HAYNES et al., Relatrices, v. DISTRICT COURT et al., Respondents.

(No. 7,708.)

(Submitted April 12, 1938.   Decided April 23, 1938.)

[78 Pac. (2d) 937.]

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr.,* for Relatrices, submitted a brief; *Mr. Goza* and *Mr. Carl N. Thompson,* Assistant Attorney General, argued the cause orally.

*Messrs. Booth & Booth,* for Respondents; *Mr. Ed. Booth, Sr.,* argued the cause orally.

Opinion: PER CURIAM.

This is an application by Blanche Haynes and another, voters and taxpayers, relatrices, for a writ of supervisory control directed to a judge of the district court of Lewis and Clark county.

The controversy involves House Bill No. 196, now Chapter 84 of the Laws of the Twenty-fifth Legislative Assembly, 1937. The Chapter carries the following title: "An Act to Regulate, License and Authorize the Sale of Liquor at Retail in the State of Montana; Authorizing, Empowering and Directing the Montana Liquor Control Board to Issue Retail· Liquor Licenses to Persons Qualified Under This Act to Sell Liquor at Retail; Defining Certain Words and Terms Used in This Act; Providing for a License Tax and Fixing the Amount of License Fees to Be Paid for Said License; Authorizing the Montana Liquor Control Board to Charge and Collect an Excise Tax on All Liquor Sold by It; Prescribing the Hours During Which Liquor May Be Sold and the Place, Manner and Conditions for the Sale Thereof; Authorizing the Sale of Liquor to Licensees by State Liquor Stores; Prohibiting the Sale and/or Traffic in Liquor Other Than Purchased at State Liquor Stores, and Prohibiting the Sale of Liquor to Minors and Other Designated Persons; Authorizing the Montana Liquor Control Board to Prescribe and Promulgate Rules and Regulations With Statutory Effect; Providing for the Suspension and Revocation of Licenses; Providing for Hearings by the Board and Appeals From Decisions Thereof; Providing for Local Option in the Counties in the State and Holding Elections in Respect Thereto; Granting to the Montana Liquor Control Board Strict Regulation and Control of Licenses and Licensees and Declaring the Policy of Law in the Sale of Liquor; Providing for Allocation of Revenue Derived from Licenses and Excise Taxes; Declaring This Act to Be an Emergency Measure; and Providing Penal-· ties for the Violation of This Act."

The first section, a sort of preamble to the Act, reads as follows: "It is hereby declared as the policy of the state that it is necessary to further regulate and control the sale and distribution within the state of alcoholic beverages, and to eliminate certain illegal traffic in liquor now existing, and to insure the entire control of the sale of the liquor in the Montana liquor control board, it is advisable and necessary, in addition to the operation of the state liquor stores now provided by law, that the said board be empowered and authorized to grant licenses to persons qualified under this act, to sell liquor purchased by them at state liquor stores at retail posted price in accordance with this act and under rules and regulations promulgated by the said board, and under its strict supervision and control, and to provide severe penalty for the sale of liquor except by and in state liquor stores and by persons licensed under this Act. The restrictions, regulations and provisions contained in this Act are enacted by the legislature for the protection, health, welfare and safety of the people of the state."

The succeeding sections provide in detail the conditions under which the expressed purposes shall be accomplished. The main purpose was to regulate the liquor traffic in Montana. It is provided that certain license fees, fines, and penalties shall be imposed and collected, and shall be paid to the state treasurer and "by him apportioned and allocated as follows: Fifty per cent (50%) to the state public school general fund and fifty per cent (50%) to the public welfare fund for the administration of the social security laws." (Sec. 29.)

The Social Security Act is Chapter 82 of the same session. The two bills, now Chapters 82 and 84, were considered by the legislature simultaneously, and were received by the Governor on the same day, March 4. Chapter 82 was approved by him on the day of its reception, and Chapter 84 on the next succeeding day, March 5.

Petitions for the referendum of Chapter 84 were circulated and filed with the Secretary of State within the time and in the manner provided in our Constitution, section 1, Article V, which declares and defines the legislative power of the Legisla-

tive Assembly generally, and reserves to the people the powers of initiative and referendum. By the section it is provided that the referendum shall be applicable to all laws ''except as to laws necessary for the immediate preservation of the public peace, health, or safety, and except as to laws relating to appropriations of money.''

The section likewise provides that a referendum may be ordered by petition signed by 5 per cent. of the legal voters of the state, provided that two-fifths of the whole number of counties of the state must each furnish as signers of such petition 5 per cent. of the legal voters in such county, and that any measure referred to the people shall still be in full force and effect unless such petition shall be signed by 15 per cent. of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, etc.

The purpose of the opponents of the measure was to take full benefit of the last-mentioned provisions, and not only refer the Act to the people for a vote, but likewise suspend its operation until after the general election which will be held on November 8, 1938.

When the petitioners believed that they had on file with the Secretary of State a petition bearing a sufficient number of signatures to require the reference and the suspension of the Act, they called upon the Secretary of State to so certify to the Governor that he might proclaim the reference and the suspension of the Act.

At this time one Higgins applied to the district court for a writ of injunction to prevent such certification and proclamation. He made the Secretary of State and the Governor defendants and prayed that they be restrained and enjoined from taking any action designed to accomplish the referendum or the suspension. He alleged, among other things, that the petition did not bear sufficient genuine signatures to justify action on the part of the Secretary of State and Governor, and thereby he challenged the sufficiency of the petition. The district court thereupon issued an order to show cause and a restraining order

to prevent further action until the question of the sufficiency of the petition could be heard. Immediately after the issuance of the restraining order, and on June 3, 1937, the present relatrices applied to this court for a writ of supervisory control to be directed against the district court requiring it to quash the restraining order and set aside the order to show cause. The application to this court was denied on the ground that the complaint in the action in the district court contained allegations of illegality and insufficiency of signatures on the petition—questions of fact—and that for this court to take exclusive jurisdiction of the matter would involve the trial of such questions of fact and the taking of testimony; and that it was more expedient to have all fact issues adjudicated in the district court. However it was understood that this court retained jurisdiction to the extent of leaving it understood that the applicants might apply for further relief at a later date whenever the necessity therefor should arise. (See *State ex rel. Haynes* v. *District Court,* 105 Mont. 604, 70 Pac. (2d) 440.)

The cause then proceeded in the district court; testimony was taken and the whole matter finally submitted to the court. It found that there were not enough signatures to the petition to suspend the Act, but that there were enough to refer it, if it were referable at all under the constitutional provision, but that the Act was not a referable measure because it was an emergency measure, an exercise of the police power of the state and necessary for the public peace, health, and safety; and further that it was an Act relating to the appropriation of money, and, therefore, not referable at all—that it was within the exceptions enumerated in the constitutional provision. Judgment was entered accordingly permanently restraining the Secretary of State and Governor from proceeding to submit the matter to referendum.

Relatrices have again applied to this court to exercise its supervisory jurisdiction. They state that they acquiesce in the finding that there were not enough legal signatures to the petition to suspend the Act, and that, therefore, the only question left for decision by this court, either on appeal or otherwise,

is as to the referability of the measure, and that the remedy by appeal is neither plain, speedy, nor adequate. They assert that the time necessary to perfect an appeal in the usual manner and obtain a ruling of this court on the question of the referability of the Act will be so great that it will be difficult, if not impossible, to comply with the legal requirements and formalities necessary for the submission of the Act in case this court should finally hold it referable, if the matter proceeds in the ordinary manner with the delays usually incident to regular appeals; that the matter is of vital importance to the citizenry and should be decided in ample time to insure a proper and legal submission thereof if this court finally decides in their favor that the Act is referable.

Of necessity we considered the jurisdictional matter when we entertained this application. We understood then that but one question—and that a judicial one—remained in the case for decision. Obviously there is an appeal, but it is equally plain that such appeal cannot afford adequate relief. The fact that there is an appeal is not conclusive of the right to relief in this proceeding. (*State ex rel. Regis* v. *District Court*, 102 Mont. 74, 55 Pac. (2d) 1295, and cases therein cited and reviewed.)

But one major question is before us for decision: Is the Act within the exceptions contained in the constitutional provision, and thereby exempt from referendum? This question as it confronts us here contemplates and includes two minor questions: (1) Does the Act relate to the appropriation of money, and (2) is it a law necessary for the immediate preservation of public peace, health, or safety? An affirmative answer to either of the minor questions commands an affirmative answer to the major question.

Is the Act a law relating to the appropriation of money? This court has had occasion to discuss and define the term ''appropriation'' as used in our Constitution and statutes. In the case of *State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841, 845, the court said: '' 'Appropriation' means an authority from the law-making body in legal form to apply sums of

money out of that which may be in the treasury in a given year, to specified objects or demands against the state." In the case of *State ex rel. Tipton* v. *Erickson,* 93 Mont. 466, 19 Pac. (2d) 227, 229, this court said: "The meaning of the term 'appropriation,' together with the manner of making the same, was the subject of discussion in *State ex rel. Toomey* v. *Board of Examiners,* supra [74 Mont. 1, 238 Pac. 316], wherein the court said: 'The word "appropriation" is defined by Webster as "the act of setting apart or assigning to a particular use or person; * * * the application to a special use or purpose, * * * as of money to carry out some public object," which definition has received the sanction of this court. (*State ex rel. Rotwitt* v. *Hickman,* 9 Mont. 370, 23 Pac. 740, 8 L. R. A. 403.) This setting apart or designation of the purpose for which public money may be used must be "made by law." This provision, however, does not require the introduction in the legislature of an appropriation bill, but the act may be accomplished in any manner receiving the sanction of the law.' " (Citing cases.)

The principal provision in the Act under consideration that has any relation to the actual use of money or funds collected under its terms is contained in section 29 thereof, which reads as follows: "All receipts from license fees, fines and penalties collected under the provisions of this Act shall be paid to the state treasurer and by him apportioned and allocated as follows: Fifty per cent (50%) to the state public school general fund and fifty per cent (50%) to the public welfare fund for the administration of the social security laws."

Thus the question is presented: Did the Act in itself authorize the expenditure of the money received into the state treasury under this Act without the aid of additional legislative action? Without doubt, Chapter 84 was the vehicle for bringing money into the public welfare fund in the state treasury, but it does not thereby authorize the expenditure of this money unless money arising from state revenues, when placed in that fund, may be expended without further legislative sanction. To answer this question we must give consideration to Chapter 82, which creates the public welfare fund. It is a special fund,

created by the Act, composed of funds derived from (1) all moneys appropriated by the legislature for public welfare purposes, (2) all money received from the United States government for public welfare purposes, and (3) all money received from other sources. Under any view, the third class cannot refer to funds received by legislative sanction, as they are included in class 1.

Section 2 of Part VIII of Chapter 82 reads as follows: "For carrying out the duties and obligations of the state department, for the performance of welfare services of the state, and for matching such federal funds as may be available for the aforesaid welfare services, the legislature shall make appropriation put out of the general fund of the state for the various and separate activities of the state department and county departments of public welfare." Thus it is demonstrated that the funds to be provided for the performance of all the duties and obligations of the state department of public welfare are provided by specific appropriation of the legislature.

By section IV of the same Part, the legislature appropriated the sum of $2,001,000 from unappropriated funds in the state treasury for administration costs and purposes of the Act. Part VIII of Chapter 82 relates to "appropriations, disposition of funds and disbursements." Nowhere in this part of the Act is any mention made of any other or further appropriation to carry out the purposes of the Act. It appears to be clear from a reading of Chapter 82, standing alone, that no further appropriation was contemplated for carrying into effect the purposes of the Act, aside from the provisions of Part VIII.

Chapters 84 and 82 were both enacted at the same session, in fact, they were transmitted to the Governor on the same day. To hold that section 29 of Chapter 84 amounts to an appropriation of money is to hold contrary to the apparent meaning of Chapter 82. In other words, if Chapter 84 makes an appropriation, it modifies or amends Chapter 82 to the extent of making an additional and independent appropriation over and above that made by Chapter 82 for public welfare purposes.

In the case of *State ex rel. Normile* v. *Cooney,* 100 Mont. 391, ▉ 47 Pac. (2d) 637, 641, we said: ''While it is true that, if one statute conflicts with a portion of another so as to exhibit an inconsistency, the inconsistent portion of the previous statute cannot stand and it is said to be repealed by implication, such repeals are not favored by the courts, and, where the two are passed at the same session of the legislature, the presumption against repeal is strong. In considering such a charge as this, the true intention of the legislature is to be ascertained, if possible, and followed, and, before the doctrine of implied repeal is applied, the court should make every effort to reconcile the statutes and render every provision of each effective. (*State ex rel. Nagle* v. *Leader Co.,* 97 Mont. 586, 37 Pac. (2d) ▉ 561.) To determine the intention of the legislature, the history of the legislation may be resorted to. (*Melzner* v. *Northern Pacific Ry. Co.,* 46 Mont. 162, 127 Pac. 146.)''

In construing a statute the court must ascertain and carry into effect the intention of the legislature, if possible. Such intention is to be gathered from the terms of the statute considered in the light of the surrounding circumstances. (*Conley* v. *Conley,* 92 Mont. 425, 15 Pac. (2d) 922; *State* v. *Bowker,* 63 Mont. 1, 205 Pac. 961; *State ex rel. Evans* v. *Stewart,* 53 Mont. 18, 161 Pac. 309.) .

The plaintiff over objection offered in the court below much evidence in an attempt to demonstrate the legislative intention in the enactment of Chapter 84. This evidence was all to the effect that the legislature passed this Act in an effort to produce revenue with which to balance the budget, or produce sufficient revenues to equal the amount of appropriations already made during the then current session of the legislature. If Chapter 84 was an appropriation measure, then all of the revenue produced under section 29 was thereby appropriated. Hence, such a construction would not produce additional revenues to balance the budget, and, therefore, is contrary to all of the evidence as to what was the purpose and intent of the legislature in passing this bill.

There is a very decided difference between an appropriation and an allocation. This distinction was pointed out by the supreme court of Arizona. There the court held that money received for certain tax collections was apportioned but was not appropriated by the Act in question; that the money could not be disbursed without further legislation. The court then proceeded to define an appropriation as "the setting aside from the public revenue of a certain sum of money for a specified object in such manner that executive officers of the government are authorized to use that money, and no more, for that object, and no other." It also said: "It will therefore be seen that * * * to make the 'appropriation,' there must be added to the dividing and assigning of funds, which constitutes the 'apportionment,' the specific authority to spend." (*Hunt* v. *Callaghan,* 32 Ariz. 235, 257 Pac. 648, 649.)

The half deposited to the credit of the Public Welfare Fund for the administration of the Social Security Laws was appropriated to such use by the appropriations contained in Chapter 82. They cannot be so used without such action, because section 2 of Part VIII of Chapter 82 provides that all state funds used by the department must be appropriated. The half allocated to the state public school general fund is subject to the provisions of a general law for the disbursement of all moneys in that fund. (Secs. 1200 et seq., Rev. Codes.) The moneys collected under the Act, when placed in the two funds, are only subject to disbursement by virtue of some other independent legislative direction.

We, therefore, conclude that Chapter 84 is not a law relating to appropriations of money within the purview of the constitutional provisions.

Is Chapter 84 a law necessary for the immediate preservation of the public peace, health, or safety? The argument on this question has largely proceeded on the theory of emergency. The Act itself only declares, "The restrictions, regulations and provisions contained in this Act are enacted by the legislature for the protection, health, welfare and safety of the people of the state."

It is significant that the legislature did not anywhere in the Act declare in the words of the Constitution. The word "immediate" does not appear at all. It is true that an Act may not be referable even though the legislature fails to make any declaration on the subject. It is common knowledge that no such declaration is made in ordinary appropriation bills, but they are nevertheless not referable.

Courts have differed vigorously as to the effect of such a legislative declaration of emergency. Years ago, in the case of *State ex rel. Goodman* v. *Stewart,* 57 Mont. 144, 187 Pac. 641, 649, this court aligned itself with the group that holds that such a legislative declaration is subject to judicial review. That position was reiterated in the more recent case of *State ex rel. Veeder* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516, 521. We see no reason for departing from that holding, nor is it necessary in this case. If the word "immediate" had been included by the legislature, we would have been confronted by the same condition that existed in the *Goodman* and *Veeder Cases,* supra.

In the *Veeder Case* this court quoted with approval a statement by the supreme court of Arkansas, *Hanson* v. *Hodges,* 109 Ark. 479, 160 S. W. 392, as follows: " 'Immediate,' in the sense of this amendment, means those laws that should take effect in order to conserve this purpose before the time when the people under the provisions of the amendment would have the opportunity to vote upon them. * * * The framers of amendment No. 10, and the people who adopted it, did not intend that laws necessary for the immediate preservation of the public peace, health, or safety should wait the slow processes of the referendum."

We are of the opinion that the element of time contemplated by the inclusion of the word "immediate," as used in the Constitution in the definition of emergency necessary to free an Act of referendum, prescribed an essential condition. The element may be deduced from the facts as we have indicated, but for the consideration of the question of what the legislature really declared, it is decisive of the contention that the legislature made

a sufficient finding on the subject, or any specific finding in conformity with the constitutional exceptions, even as construed by those courts which hold that such a legislative finding, when made, is conclusive upon the courts and the world.

To us it seems that the word "immediate" is the keystone of the arch of exceptions enumerated in the section. It is the magic key necessary to unlock the door to the absolute and final legislative authority of the assembly on a given Act. In the absence of a legislative finding of immediate necessity, the Act is presented to us as an original proposition, without any antecedent classification, that we may decide from its contents, from the provisions thereof, whether it presents such an emergency as comes within the constitutional exceptions. (See *State ex rel. Goodman* v. *Stewart,* supra.)

What we have said about the failure of the legislature to actually classify the Act, by use of the word "immediate," must not be taken as meaning that the inclusion of the word would have freed the Act from referendum. It could not have finally effected that result, because after all the rule in this state is that, in spite of any attempt by the legislature to define an Act in this respect, still the proposed law and its provisions must stand an acid test.in the courts as to its actual character. The failure to include the word or term only relieves this court of the necessity of discussing the effect of such a legislative declaration. The final result would have been the same as we shall proceed to demonstrate.

At the inception we call attention to the fact that the preamble of the Act starts off with a statement of a declared policy of the state with relation to the liquor traffic. That preamble, without the element of emergent immediacy is nothing more than a plain, ordinary declaration of state policy. It is true that the Act was, as stated, passed in the legislative exercise of the police power inherent in the state. But that fact is not particularly significant here. "Police power" is a comprehensive and broad term. It includes much. One court, in speaking of the police power, said: "[It] is so broad and so variant with time and circumstances that its limits cannot be defined."

(*State ex rel. Case* v. *Howell*, 85 Wash. 281, 147 Pac. 1162, 1163;
*State ex rel. Brislawn* v. *Meath*, 84 Wash. 302, 147 Pac. 11.)
The same cannot be said of the exceptions contained in the con-
stitutional provision. Cases too numerous to cite have construed
the meaning and the implications of just such reservations as
those contained in our constitutional provision, but all have
hesitated to attempt to strictly define or restrict the meaning
of the general term "police power." (See *Cunningham* v.
*Northwestern Imp. Co.*, 44 Mont. 180, 119 Pac. 554.)

In considering the question of referability without any declara-
tion of the legislature on the subject, as we must, it is
necessary to do so in the light of certain principles which are
generally recognized and which this court announced and com-
mented upon in the *Goodman* and *Veeder Cases,* supra. In the
*Goodman Case* this court said, in substance, that with the ex-
pediency, utility, justice, or the necessity for the legislation we
are not concerned; that our only concern is with the necessity
of the passage of the Act without permitting the people to accept
or reject it at the polls, under their reserved right, for the im-
mediate preservation of the public peace and safety; that such
a consideration embraces more than a mere scanning of the
Act, but requires that under recognized rules there should be
an actual determination on the part of the court as to whether
the Act does actually come within the class of subjects neces-
sary for the immediate preservation of the public peace and
safety. The court there said: "The people said to the legisla-
ture, Make such laws as you will, but you may not legislate so
as to take away our right to pass upon the laws you have en-
acted, 'except such laws as may be necessary for the immediate
preservation of the peace, health, and safety.' " The court then
said, in speaking of the matter for decision: "In this determi-
nation the utmost that we can take into consideration will be
the face of the Act itself; the history of the legislation, and
contemporaneous declarations of the legislature [citing cases];
the evil to be remedied [citing cases]; and the natural or
absurd consequences of any particular interpretation."

With these principles in mind, we must consider Chapter 84 ■ and decide whether it fairly comes within the purview of the exceptions enumerated in the Constitution. It must not be forgotten that the general rule is that all bills shall be referable except such as come within these exceptions.

We have examined many cases involving the referability of legislative Acts, but, due to the difference in constitutional provisions, those cases are not especially helpful to us. The only light thrown upon this question is in those cases which construe a set of facts to be or to be not *immediately* necessary for the public peace, health, or safety. The closest case, from a point of fact, is that of *State ex rel. Burt* v. *Hutchinson,* 173 Wash. 72, 21 Pac. (2d) 514, involving the referability of an Act regulating horse racing in the state of Washington, by the use of pari-mutuels. In that case the court summarily dismissed the contention that such an Act was one of *immediate* necessity, and held that such a conclusion would be absurd. In the case before us, as in other cases, the court must be confined to the particular Act sought to be referred. The general subject matter of the Act is too plainly stated in the title and in the preamble to be misunderstood. It obviously involves the broad question of the regulation of the liquor traffic. It is not a new subject. That subject has been with us for generations. Now the declared purpose of this Act is to adopt a new system of regulation. It is not the province of this court to say that the plan is good, or that it is bad. The prerogative belongs to the people, either acting directly or through the delegated power of the legislature. With these matters we have no present concern. This court can take judicial notice of what has occurred with relation to the liquor business in the past. In 1915, after a long period of existence of saloons, the Legislative Assembly enacted a state prohibition law. However, it is significant that such an important change in the economic and social scheme of our people was not deemed sufficiently emergent to warrant putting it into effect without reference to the people. The Act itself provided that before it should go into effect it should be

voted by the people in the general election in 1916, and that, if approved by a majority at that election, it should not go into effect until December of 1918. The Act was approved by the people and we had state prohibition for several years. In the interim the Eighteenth Amendment to the Constitution of the United States was enacted, and we had concurrent federal and state prohibition.

Since the effective date of the State Prohibition Act, there has been no legalized retail traffic in liquor in the state of Montana, except by the state liquor stores in recent years. It is true that the state prohibition law was repealed, but that was done by the people. With the exception of the installation of the state liquor stores, every important step that has been taken on the liquor subject was either taken by or submitted to the people, until the Act under consideration.

If we could say that there is anything new, anything emergent, anything requiring immediate action to protect the rights of the people, then we would say that this bill might be freed from referendum. But it is impossible for us to see anything but a recurrence of the old, old question. We are constrained to say that, whereas the people themselves voted the retail liquor business out of the picture, it is not unreasonable for them to assert the right to vote it back in if it is within their power to do so under the Constitution.

We hold that it cannot be fairly said that Chapter 84 is a law for the immediate preservation of public peace, health, and safety. We hold that the Act as a whole, in accordance with the declarations of its title and preamble, tenders and contemplates a very comprehensive state policy of a permanent character.

It follows from what we have said that the injunction issued by the district court is erroneous; that it is too sweeping. It should be modified so as to restrain the suspension of the Act, but it should not restrain the reference thereof. It is the duty of the court to make such necessary changes as will conform to what we have said in this opinion. It will then be the duty of the defendants in the original action, the Secretary of State and

486

the Governor, to proceed with all reasonable dispatch in conformity with the provisions of the Constitution and the statutes to arrange for the referendum of the Act.

Let a writ issue.