MARTIN, Plaintiff, *v.* STATE HIGHWAY COMMISSION
ET AL., DEFENDANTS.

(No. 7,943.)

(Submitted February 20, 1939.  Decided February 25, 1939.)

[88 Pac. (2d) 41.]

604

*Mr. Walter H. Balkovatz,* for Plaintiff, submitted a brief and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Enor K. Matson,* Assistant Attorney General, and *Mr. Ernest A. Peterson,* Special Assistant Attorney General, for Defendants, submitted a brief; *Mr. Peterson* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original proceeding to enjoin defendants from issuing and selling debentures provided for by Initiative Measure No. 41, adopted at the general election on November 8, 1938. The action questions the validity of that measure on several grounds.

In general, the Act provides for the issuance and sale of state debentures in the sum of $3,000,000 from time to time as required and determined by the State Highway Commission in order to raise funds for matching federal grants for highways, the debentures to bear interest at a rate not exceeding 4% per annum, payable semi-annually. The debentures shall mature at the expiration of ten years from their date, but are callable after five years. A license tax of five cents per gallon on the sale of gasoline is imposed by the Act with which to raise money to pay the principal and interest on the debentures. The Act provides that the issuance and sale of the debentures shall constitute an irrevocable contract between the state and the holder of the debentures that the tax shall not be repealed, reduced or diverted to any other purpose so long as any of the debentures remain outstanding and unpaid.

The first attack made upon the measure is that it conflicts with section 23 of Article V of the Constitution, which provides that, "No bill * * * shall be passed containing more than one subject, which shall be clearly expressed in its title."

The title to the measure reads as follows: "A bill to enact by the Initiative a law to be known as the State Highway Treasury Anticipation Debentures Act of 1938; authorizing the issuance of debentures of the State of Montana in the principal sum of Three Million Dollars ($3,000,000) at such times and in such

amounts up to the said principal sum, as shall from time to time be required for the purpose hereinafter set forth; and providing for the sale thereof for the use of the State Highway Fund in matching federal highway grants and assuring the ability of the state of Montana to secure moneys made available by Acts of Congress in reference to highways; providing for a tax on gasoline or motor fuels and anticipating revenues therefrom; prescribing the form and conditions of said debentures and interest thereon at a rate not exceeding four per centum (4%); providing the date of their maturity and of calling or payment thereof; providing a method by which the State Treasurer may purchase such debentures and providing that such debentures may be accepted as security for the repayment of public moneys; prescribing the conditions under which the sale of such debentures may be made and the use of the funds to be derived from the sale of such debentures; providing for the repayment of both principal and interest of such debentures and for the pledging and setting aside of a sufficient amount of said excise tax on gasoline or motor fuel to pay the same from the State Highway Treasury Redemption Fund herein created; providing for the creation of a liability binding the state of Montana not to reduce the license tax on gasoline or motor fuel as the same now exists, being now five cents (5¢) per gallon of gasoline purchased for use in propelling motor vehicles upon the highways of the state of Montana, until after the accrual of a sufficient amount of money in such Highway Treasury Redemption Fund to pay in full the principal and interest of such debentures lawfully issued under the authority hereof; and providing that no part of the gasoline excise tax mentioned be diverted to any other purpose than use for highway construction betterment and maintenance.''

The purpose of section 23, Article V of the Constitution is, ''to restrict the legislature to the enactment of laws the objects of which legislators and the public as well may be advised of, to the end that any one who is interested, whether as representative or those represented, may be intelligently watchful of the course of the pending bill. The limitation is

likewise designed to prevent legislators and the people from being misled by false or deceptive titles, and to guard against fraud in legislation by way of incorporating into a law provisions concerning which neither legislators nor the public have had any intimation through the title read or published. (*Commonwealth* v. *Brown,* 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110.)'' (*State* v. *Anaconda Copper Min. Co.,* 23 Mont. 498, 59 Pac. 854.)

The main purpose and object of Initiative Measure No. 41 ■ is to raise revenue for highway construction and betterment. All provisions of the Act have a natural connection, and relate directly or indirectly to this one object and purpose. This being so, the Act is not invalid as containing more than one subject. (*Merchants' Nat. Bank* v. *Dawson County,* 93 Mont. 310, 19 Pac. (2d) 892, and cases therein cited.) An Act similar in purpose and containing a title practically the same as that here was held not open to the objection here made, in *Arps* v. *State Highway Com.,* 90 Mont. 152, 300 Pac. 549.

The next contention is that the Act is invalid because the ■ people, under section 1 of Article V of the Constitution, have not the right to enact legislation ''relating to appropriations of money.'' Does Initiative Measure No. 41 relate to appropriations of money within the meaning of section 1, Article V? This same point was urged against the validity of Initiative Measure No. 19, in the case of *State ex rel. Bonner* v. *Dixon,* 59 Mont. 58, 195 Pac. 841. The Act involved in that case is found on page 701 of the 1921 Session Laws. It authorized a bond issue in the sum of $5,000,000 for the purpose of constructing, repairing and equipping necessary buildings at the several state educational institutions. It levied a tax in order to raise a sinking and interest fund for the payment of the principal and interest on the bonds. It was held not to be an Act relating to the appropriation of money. This court made reference to the constitutional provisions wherein the word ''appropriation'' was used, and concluded that, as used in the Constitution, it ''has reference exclusively to the general fund, or at any rate a fund already existing or for which

provision has been made." The court, in speaking of the restriction against the initiation of a measure relating to an appropriation, said: "The restriction in this constitutional provision is clearly directed to the exclusion of appropriation measures from the operation of the initiative and referendum with which the legislative body and not the general public are familiar." The court further said: "Here, the Act providing for the raising of the funds is contemporaneous with provision for its disposition, so that, unless there was a fund in the state treasury or one provided for to be placed in the treasury and drawn upon in the future, there is no 'appropriation.' As used in the constitutional provision, in our opinion, it relates to the general, or at least to a special, fund of the state, rather than such as may be received in the treasury and credited to a particular fund from the sale of an authorized bond issue."

Counsel for plaintiff contends that the *Bonner Case* is simply authority for the proposition that the Act there considered did not constitute an "appropriation" so far as the proceeds derived from the sale of the bonds were concerned, but that it did not specifically pass upon the question whether it constituted an appropriation of the moneys derived from the tax levy and used to retire the bonds. The last above quoted sentence from the opinion, standing alone, supports plaintiff's contention; however, when the opinion in its entirety is considered, the contention cannot be sustained.

The court in the *Bonner Case* made this further statement: "The Act in question is self-executing, the money derived from the bonds is to be placed in a specific fund designated as the 'State Educational Bond Sinking and Interest Fund,' and no appropriation of such fund is requisite as a condition precedent to its being paid out on warrant." That statement also supports plaintiff's contention until it is closely analyzed in connection with the Act there being considered. Under Initiative Measure No. 19 the proceeds from the sale of the bonds were not placed in the State Educational Bond Sinking and Interest Fund, but were paid into the state treasury as a

special fund for the construction, repair and equipment of the necessary buildings contemplated. (Section 6 of the Act, p. 705, 1921 Session Laws.) It was only the proceeds of the tax levy that were placed in the State Educational Bond Sinking and Interest Fund. (Sec. 7 of the Act.) Hence, when the court used the language last above quoted, it was speaking of the proceeds derived, not from a sale of the bonds, but from the taxes imposed by the Act.

To say that the Act here in question does not make an appropriation of money is fallacious. (See *State ex rel. Haynes* v. *District Court,* 106 Mont. 470, 78 Pac. (2d) 937.) But as that phrase is used in section 1, Article V, Constitution, and as construed in *State ex rel. Bonner* v. *Dixon,* supra, it is only when an appropriation is made from the general fund, or from an existing fund, that that section has application. It is to be noted that under laws existing prior to the Act in question here, there was already a license tax of five cents per gallon on the sale of gasoline, and the question suggests itself as to whether, when the Act in question here simply continues that tax for the purpose of raising funds to retire the debentures, it is not making an appropriation of a fund already existing for which provision has been made within the meaning of the opinion in the *Bonner Case.* This suggested question, however, is disposed of by the *Bonner Case* in which the court pointed out that section 1 of Article V has application only to a ''fund in the state treasury or one provided for to be placed in the treasury.'' The proceeds of the gasoline license tax under the law in effect at the time of the adoption of Initiative Measure No. 41 did not become a part of the funds of the state treasury but were paid into the ''State Highway Fund,'' and used for the construction, reconstruction, betterment and maintenance of highways. (Sec. 2381.22, Rev. Codes.)

It is true that Chapter 95, Laws of 1931, specified that the tax should be paid to the State Board of Equalization for deposit into ''the state treasury,'' but that chapter does not purport to repeal Chapter 178, Laws of 1929, now section 2381.22. Initiative Measure No. 41 contains the same provision, but ob-

viously, before the tax is paid into the state treasury, if at all, there must first be deducted such amounts as are required by the Act to be set aside for the State Highway Treasury Debentures Redemption Fund. Only to the extent that Initiative Measure No. 41 appropriates funds to be placed in the Debenture Redemption Fund can it be said to be an appropriation measure. Since that money is set aside before the proceeds of the tax go into the state treasury, if in fact they do go there, it cannot be said that the Act appropriates money from the state treasury.

While the question is not directly involved here, we think section 2381.22 is still in effect and was not repealed by Initiative Measure No. 41.

The Act in question here, in effect, simply makes available for present use funds to the extent of $3,000,000 to be derived from this tax in the future. We hold on the authority of the *Bonner Case* that Initiative Measure No. 41 is not an Act relating to an appropriation of money within the meaning of section 1, Article V, of the Constitution.

The next contention is that the Act violates section 34, Article V of the Constitution. That section reads in part as follows: "No money shall be paid out of the treasury except upon appropriation made by law." As above stated, the Act does appropriate money (*State ex rel. Haynes* v. *District Court,* supra), but since it is not appropriated out of the state treasury, neither this section nor section 1, Article V, has application.

Plaintiff contends that section 2 of Article XIII, Constitution, is violated by the Act, in that it does not levy a tax sufficient to pay the interest on and extinguish the principal of of the debt within the time limited by the law for the payment thereof. By admissions in the pleadings we are informed of the net revenues from the five cents per gallon gasoline tax since 1931. They are shown to have been as follows:

| Year | Net |
|------|-----|
| 1931 | $2,991,006.57 |
| 1932 | 2,658,554.58 |
| 1933 | 2,719,791.34 |
| 1934 | 3,559,030.63 |

| Year | Net |
|------|-----|
| 1935 | $3,806,726.26 |
| 1936 | 4,421,521.37 |
| 1937 | 4,534,151.39 |
| 1938 | 4,410,958.75 |

Under the Act, the state treasurer is required to set aside from the taxes imposed by the Act into the "State Highway Treasury Debenture Redemption Fund, a sufficient amount of money each month during the years 1939, 1940 and 1941, to provide for the payment of the interest accruing during said years, and beginning with the month of January, 1942, and each month thereafter, he shall set aside in such fund from said proceeds sufficient money to provide for the payment of the interest accruing in 1942 and each subsequent year, and in addition thereto he shall set aside in such fund at least a sufficient amount of money to provide in the aggregate for the payment of the principal amount of all such debentures at the maturity of each thereof and such further amounts as the State Highway Fund and the necessities for the use thereof will warrant, from time to time for the purpose of calling and retiring debentures before their maturity dates as in this Act permitted."

The tax does not appear to be inadequate to meet the payment of the debentures maturing under the terms of Chapter 95 of the Laws of 1931, and to provide ample revenues to pay the interest and principal of the debt created by Initiative Measure No. 41 within the time limited for the payment thereof. We must presume it will be sufficient in the absence of a contrary showing. (*State ex rel. Bonner* v. *Dixon,* supra.)

It is contended that since the amount of debentures to be issued, the time when to be issued and the interest rate subject to a maximum rate are left in the discretion of the Highway Commission, the Act must fall because delegating legislative power. This court in *Herrin* v. *Erickson,* 90 Mont. 259, 2 Pac. (2d) 296, held that under section 2 of Article XIII of the Constitution, the law itself must create the debt and not leave it to succeeding legislative assemblies to act on the au-

thorization. Here no further legislative act is necessary to create the debt in the maximum of $3,000,000. This case, on this point, is identical with that of *Arps* v. *State Highway Com.*, supra, wherein a series of loans to be made from time to time subject to a maximum amount was upheld. That case is decisive of this on the point now being considered. No further legislation is necessary to place sufficient proceeds from the tax levy in the Debenture Redemption Fund for retirement of the debentures or for any other purpose.

The next contention is that the Act violates section 12 of ▉ Article XII of the Constitution, which provides that "no appropriation of public money shall be made for a longer term than two years." The word "appropriation" as there used does not have application to an Act providing for the issuance of bonds or debentures, wherein the Act creating the debt also levies a tax sufficient to pay the debt. (*State ex rel. Bonner* v. *Dixon,* supra.) To hold otherwise would be to hold that a bond issue could never extend over a period of more than two years; because if a biennial appropriation to retire such a debt is necessary, the legislature would have the right to withhold the appropriation, and therefore the law creating the debt would, in effect, be repealable contrary to the command of section 2, Article XIII. The contention that the proceeds from the gasoline license tax sufficient to retire the debentures cannot be appropriated for more than two years is untenable.

Plaintiff attacks the Act because, as he alleges, persons not ▉ qualified under section 1, Article V of the Constitution, signed the petitions for the initiation of the Act, and persons not qualified under section 2, Article IX of the Constitution as amended in 1932, voted on the measure. Defendants by their answer deny these allegations and deny authority in plaintiff to question these matters, on the ground that the certificates of the county clerks of the several counties, and the proceedings of the secretary of state had thereon, are conclusive of the qualifications of the voters; and that plaintiff is estopped by section 101, Revised Codes, from objecting to the qualifications of the persons signing the petitions.

Section 1 of Article V of the Constitution requires eight per cent. of the legal voters of the state to propose a measure by initiative petition, and requires that two-fifths of all the counties must each furnish as signers eight per cent. of the legal voters in such county. Here it is shown that eight per cent. of the legal voters as determined by the number of votes cast for Governor at the regular election last preceding the filing of the petition, which is the criterion fixed by section 1, Article V, in ascertaining the required number, was 18,136. The petition filed contained 30,734 signatures and every county in the state had more than eight per cent. of its voters as signers on the petition. At the election the measure carried by the vote of 126,247 for and 32,134 against the measure. We shall first consider the question whether plaintiff is in a position to question the qualifications of the signers on the petition.

Section 101, Revised Codes, makes the certificate of the county clerk ''prima facie evidence of the facts stated therein, and of the qualifications of the electors whose signatures are thus certified to be genuine.'' It does not purport to make the certificate conclusive. The effect of such a certificate, as well as the function of the secretary of state in relation thereto, was before this court in the case of *State ex rel. Haynes* v. *District Court*, 105 Mont. 604, 86 Pac. (2d) 4, and the majority of the court held that the qualifications of the signers could be inquired into by the courts. In that case, however, the question was presented before the election, and it was specifically alleged in the complaint that without the illegal signatures there were not enough to accomplish the suspension of the law. Here it does not appear that there were enough illegal signers to reduce the number below the eight per cent. required by section 1, Article V. We think the rule applicable here was announced in *Potter* v. *Furnish*, 46 Mont. 391, 128 Pac. 542. The court pointed out that the ''record fails to disclose that if there were such qualified electors denied the right to vote, the number was sufficient to change the result, even assuming that all such would have voted against some or all of the propositions submitted at this election. * * * It is a

rule of well-nigh uniform recognition that, after an election has been held, a party will not be permitted to challenge it unless he can show that a different result would have been reached but for the conditions of which he complains.'' To the same effect see: *State ex rel. Hay* v. *Alderson,* 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B, 39; *Weber* v. *City of Helena,* 89 Mont. 109, 297 Pac. 455; *Shekelton* v. *Toole County,* 97 Mont. 213, 33 Pac. (2d) 531.

We now come to the question of the effect of the constitutional amendment adopted in 1932. It should be said at the outset that it has nothing to do with the qualifications of signers on the petition, but only with the qualifications of those voting on the measure when submitted. It is found in Chapter 101 of the Laws of 1931, and relates to the qualifications of voters. The particular portion of the amendment in question here is the provision reading: ''If the question submitted concerns the creation of any levy, debt or liability the person, in addition to possessing the qualifications above mentioned, must also be a taxpayer whose name appears upon the last completed assessment roll, in order to entitle him to vote upon such question.''

That Initiative Measure No. 41 creates a liability we have definitely held in *State ex rel. Dieterichs* v. *State Highway Com.,* 89 Mont. 205, 296 Pac. 1033. Since the Act creates a liability, the constitutional amendment has application. However, it was not shown here that a different result would have obtained at the polls had the question been submitted to the taxpayers only as the Constitution commands. Where, as here, the contention arises after the election and not before, and where no showing is made that the measure would have been defeated had it been submitted to taxpayers only, the fact that some were permitted to vote who were not qualified will not defeat the measure. As above pointed out, the measure carried by nearly four to one. We fail to see how plaintiff, or anyone else, could at this time show that if the measure had been submitted to taxpayers only, it would have been defeated.

616

In other words, it is virtually impossible to make this objection effective after such a decisive election. Under the circumstances the Act will not fail on this account.

It is urged that the Act is indefinite and uncertain in several respects to the extent that it cannot be put into operation. Section 3 of the Act provides in part that the debentures "shall be due and payable as provided in section 1 of this Act." Section 1 does not deal with the subject as to when the debentures will be due and payable, but section 2 of the Act does. To carry out the obvious intent of the Act, we are permitted to correct manifest error. (*State ex rel. Griffin* v. *Greene*, 104 Mont. 460, 67 Pac. (2d) 995.) The language above quoted from section 3 may be eliminated as meaningless surplusage and the Act is still complete. The intent is so obvious to make the debentures due and payable as provided in section 2 of the Act that no further comment on the point need be made.

Section 10 and 13 of the Act, respectively, make reference to the "election herein provided for" and the "election herein called," whereas the Act does not provide for or call an election. It is suggested that because of this the Act is invalid. The objectionable words may be treated as surplusage. The Act was submitted at a general election as provided in section 1 of Article V of the Constitution, and its validity is not affected by the inclusion of the erroneous language alluded to.

The next ground of ambiguity is that section 3 of the Act makes the debentures payable to the "bearer at the office of the state treasurer of the State of Montana at Helena, Montana," and section 2 makes them redeemable after five years upon at least thirty days' notice "to the owner or holder thereof, by registered mail, prior to the date" they are called for payment. It is contended that the state treasurer will not be able to comply with section 2 because he cannot know who the owners and holders of the debentures may be. It is true that this section cannot be complied with. This does not, however, affect the validity of the Act or the debentures issued thereunder. Also, by Senate Bill No. 92 passed by the Legis-

lative Assembly of 1939, this and other defects above referred to have been amended and any supposed ambiguity removed.

It is argued that the Act is invalid because it makes no ▮▮▮▮▮ provision for payment of the outstanding debentures issued under Chapter 95, Laws of 1931, from proceeds of the gasoline license tax. Those debentures will not all have matured until in 1940. (Sec. 2, Chapter 95, Laws of 1931.) When Chapter 95 was passed it became irrepealable (sec. 2, Art. XIII, Constitution), and when debentures were issued pursuant thereto, there was created an irrevocable contract between the state and the purchasers of the debentures (*State ex rel. Tipton* v. *Erickson,* 93 Mont. 466, 19 Pac. (2d) 227.) Initiative Measure No. 41 does not attempt to repudiate the state's obligation under Chapter 95, Laws of 1931. While that Chapter in effect was repealed by the Act here under consideration, yet it substituted exactly the same tax until March, 1941, and raised the tax from three to five cents per gallon thereafter. The Act recognizes that the debentures issued under Chapter 95 must be paid from the proceeds as before. Thus in section 4 it is provided that such tax, ''as provided in this Act, or *in any of the other laws of the state of Montana,* shall not be reduced, or any part thereof diverted to any other purpose *than as at present provided by law* so long as any of said debentures remain outstanding.''

Another circumstance which indicates that the drafters of Initiative Measure No. 41 intended that the debentures provided for by Chapter 95, Laws of 1931, should be paid out of the proceeds of the gasoline license tax continued in effect by the Act, is the fact that the last maturing debentures under Chapter 95 mature in 1940, and hence some will be maturing in each of the years 1939 and 1940, and during that time the Act here in question makes no provision for accumulating a fund with which to meet the principal of the debentures to be issued under the Act. In other words, it is not until in 1942 that the Act involved here requires money to be set aside to meet the principal of the debentures. Doubtless, the outstanding reason for the delay in commencing to set aside a fund to meet the prin-

cipal on the debentures was the fact that during 1939 and 1940 debentures maturing under Chapter 95, Laws of 1931, had to be retired.

Some contention is made that the license tax on the sale of ▉ gasoline must now be taken to be ten cents per gallon. This is not so. The Act here simply continues the tax of five cents per gallon already in effect. This identical question was before the court in the case of *Arps* v. *State Highway Com.*, supra. In that case it was contended that Chapter 95 created a tax of five cents per gallon on the sale of gasoline in addition to the five cents tax provided for in Chapter 6, Laws of 1931. But the court pointed out that Chapter 95 contained this clause: "It is hereby provided that if this Act shall fail to receive the approval of the people at the general election herein provided for, nothing herein contained shall operate to repeal or amend any of the laws of the State of Montana relating to the excise taxes on gasoline or motor fuels." In speaking of the effect of this paragraph the court said: "We think it is plain from this section, in view of the history of this legislation and the purpose to be accomplished by it, that it was the intention of the legislature that if Chapter 95 did receive the approval of the people it would operate to repeal all other laws relating to the excise tax on gasoline and motor fuels. This intention is also manifested by the fact that Chapter 95 does not limit the tax to the necessary revenue to discharge the debt or liability created by it, but undertakes to embrace all of the provisions previously incorporated in Chapter 6. It specifically provides what the tax rate shall be after 1941 as well as before, and thus, being the later enactment it entirely supersedes and repeals all prior Acts relating to the tax rate." The Act here in question contains the identical paragraph contained in Chapter 95 above quoted.

We hold under the authority of the *Arps Case,* supra, that Initiative Measure No. 41 for the same reason supersedes and repeals all prior Acts relating to the tax rate on gasoline and motor fuels. By doing so in the manner in which it is done, that is, by adopting and continuing the same rate as the

prior law, there has been no impairment of the security for the payment of the debentures issued under Chapter 95. Those debentures must be paid from the proceeds of the tax in addition to setting aside the necessary amounts for interest and principal on the debentures to be issued under Initiative Measure No. 41.

We find no reason for condemning the Act in question, or for restraining the issuance and sale of the debentures. The writ applied for is denied.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, STEWART and ERICKSON concur.