GEORGE R. SLAMA & others *vs.* ATTORNEY GENERAL & another.

Suffolk.   October 9, 1981. — November 17, 1981.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law*, Initiative, Standing, Appropriation of money.  *Initiative.  Practice, Civil*, Parties.  *Municipal Corporations*, Standing to assert constitutional right.  *Words*, "Specific appropriation."

The city of Boston lacked standing, either in its own right or in a representative capacity, to seek a judgment ordering the Attorney General and the State Secretary to perform certain constitutionally prescribed functions with respect to an initiative petition. [622-625]
A proposed law which would set aside money from the Commonwealth's treasury and place it in local personal income tax and local sales and use tax funds, which each city and town might employ as it chose, made a "specific appropriation" from the treasury, as comprehended by art. 48 of the Amendments to the Constitution of the Commonwealth, and thus was not an appropriate subject for an initiative petition. [625-627]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 24, 1981.

The case was reported by *Nolan*, J.

*Craig E. Stewart* (*Douglas H. Wilkins* with him) for George R. Slama & others.

*Harold J. Carroll*, Corporation Counsel, for the city of Boston, joined in a brief.

*Alexander G. Gray, Jr.*, Assistant Attorney General, for the Attorney General & another.

ABRAMS, J.  George R. Slama and eleven other qualified voters (first signers) signed an initiative petition entitled "An Act providing for the participation of the municipalities in State taxes generated in those municipalities" (Initiative 11/81).  Citing art. 48 of the Amendments to the Massachusetts Constitution, the Attorney General refused to certify Initiative 11/81, because it "makes a specific appropriation of money from the treasury."

The first signers and the city of Boston sought an injunction from a single justice compelling the Attorney General to certify and prepare a fair and concise summary of Initiative 11/81. In addition, the plaintiffs asked the single justice to order the State Secretary to prepare blank signature forms for Initiative 11/81. The single justice reserved and reported the following two questions for the court's consideration: "1. Whether the initiative petition . . . makes a specific appropriation of money from the treasury of the Commonwealth within the meaning of Mass. Const. Art. Amend. 48, Init., Pt. 2, § 2. 2. Whether the City of Boston has standing to join this suit as a plaintiff."

On October 19, 1981, we issued an order that "[t]he case is remanded to the county court where judgment is to be entered declaring that the initiative petition 11/81 is a specific appropriation measure and thus prohibited by Mass. Const. Art. Amend. 48, Init. Pt. 2, § 2." The motion to dismiss the city of Boston as a party plaintiff was also allowed.

We summarize the statement of agreed facts and the provisions of Initiative 11/81. Initiative 11/81 requires the Commonwealth to share its sales, use, storage, consumption and income tax revenues with the cities and towns that generate these revenues. It is the initiative's stated purpose "(a) to encourage and facilitate reductions in local property taxes without causing serious disruptions in the level or quality of essential municipal services; (b) to diversify the sources of municipal tax revenue; and (c) to allow each city and town to share with state government the increases in tax revenue generated by the local economy of that city or town."

To achieve these goals, Initiative 11/81 calls for the creation of two separate funds, the local sales and use tax fund and the local personal income tax fund. Within each fund, Initiative 11/81 sets up separate accounts for each city and town. The local sales and use tax fund would consist of not less than one-fifth of all net receipts from the sales and use tax. G. L. c. 64H, c. 64I. If the vendor collects the excise in Massachusetts, the net receipt would be credited to the

city or town in which the vendor maintains the place of business where the sale or other transaction occurred. But if the vendor collects the excise outside the State or if the excise is paid directly to the Commonwealth, the receipt would be directed to the account of the municipality where the sale or transaction occurred.

The local personal income tax fund would be funded as follows. No less than ten per cent of the net tax on interest, dividends, and capital gains would be credited to the account of the city or town where the taxpayer resides. At least five per cent of the net tax on income other than interest, dividends, and capital gains derived from real or tangible personal property located in Massachusetts would be credited to the city or town that is the situs of the property. No less than five per cent of the net tax on employment income would be credited to the municipality in which the employer's principal place of business is located. At least five per cent of the net tax on income other than interest, dividends, and capital gains would be credited to the city or town where the taxpayer resides. Initiative 11/81 would distribute both funds to each city and town. All funds so allocated would be transferred automatically without appropriation by the Legislature.

*Motion to dismiss.* The plaintiffs in this action are twelve qualified voters who signed Initiative 11/81, and the city of Boston. The Attorney General moved to dismiss the city from the action, claiming that Boston was not a proper plaintiff in this case.

"Traditionally we have considered the first ten signers of an initiative or referendum petition to be proper parties in moving through the courts to protect their petition. See *Cohen* v. *Attorney Gen.*, 354 Mass. 384 (1968); *Compton* v. *State Ballot Law Comm'n*, 311 Mass. 643 (1942); *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365 (1931)." *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 197-198 (1976). The Attorney General does not challenge the right of the twelve qualified voters who signed Initiative 11/81 to bring this action. The only issue is whether the city of Boston also may be a plaintiff.

The purpose of art. 48 is to give a greater voice in the government to the people. "The object and purpose [of the initiative] . . . is to give to the people of the Commonwealth a larger control and domination over legislation, to enable the people to have some say which now they do not have with regard to constitutional amendments and also with regard to the laws which shall be enacted." Sherman L. Whipple of Brookline, 2 Debates in the Massachusetts Constitutional Convention of 1917-1918, at 39 (1918).

Thus, in art. 48, the people "reserve to themselves the popular initiative." The people referred to in art. 48 are qualified voters.[1] "The 'people' in the Constitution in a practical sense means those who under the existing Constitution possess the right to the elective franchise and who . . . will be the sole organs through which the will of the body politic can be expressed. 'People for political purposes must be considered synonymous with qualified voters.' *Blair* v. *Ridgely*, 41 Mo. 63, 176, 177 [1867]; *Boyd* v. *Thayer*, 143 U.S. 135, 158, 161 [1892]; Cooley, Const. Lim. (7th ed.) 57, 58. See Vol. II Works of James Wilson, (Andrews ed.) 6." *Opinion of the Justices*, 226 Mass. 607, 611 (1917).

Boston, like any corporation, "has no right to vote and no right to submit initiative petitions for enactment by the people. It has asserted no rights guaranteed it under the Constitution of the United States . . . ." *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth*, 375 Mass. 85, 91 (1978). Moreover, "[a] municipality has no authority to appropriate funds for the purpose of taking action to influence the result of a referendum proposed to be submitted to the people at a State election." *Anderson* v. *Boston*, 376 Mass. 178, 183 (1978). Since the Attorney General's failure to certify Initiative 11/81 has not affected any right belonging to the city itself, Boston lacks standing as a plaintiff on its own.

---

[1] Similarly in *Litton Business Sys., Inc.* v. *Commissioner of Revenue*, 383 Mass. 619 (1981), we limited the words "taxable inhabitants" in G. L. c. 40, § 53, to natural persons.

Although its own constitutional rights have not been infringed, the city argues that it has standing in a representative capacity. In making this argument, the city relies on *Wilmington* v. *Department of Pub. Utils.*, 340 Mass. 432 (1960), and several United States Supreme Court decisions allowing injured parties to assert the rights of others.[2] See *Craig* v. *Boren*, 429 U.S. 190, 195-197 (1976); *Roe* v. *Wade*, 410 U.S. 113 (1973); *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 64-65 n.6 (1963). Representative standing is generally limited to cases in which it is difficult or impossible for the actual rightholders to assert their claims. See *Wilmington* v. *Department of Pub. Utils.*, 340 Mass. 432, 437-439 (1960). See also *Eisenstadt* v. *Baird*, 405 U.S. 438, 446 (1972); *Barrows* v. *Jackson*, 346 U.S. 249 (1953); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 425 (1974); L. Tribe, American Constitutional Law § 3-26 (1978).[3] However, in election cases, it is neither difficult nor impossible for qualified voters to assert their claims. Thus, we see no reason to depart from the general rule that "[o]rdinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows* v. *Jackson*, 346 U.S. 249, 255 (1953).

Even if the twelve qualified voters were not parties, the city would not have standing. To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury. See *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208 (1974); *Tileston* v. *Ullman*, 318 U.S. 44 (1943). See also Note, Standing to Assert Constitutional Jus Tertii, *supra* at 428-431; L. Tribe,

---

[2] In *Lamson* v. *Secretary of the Commonwealth*, 341 Mass. 264, 268 (1960), we did not decide whether the representative standing theory of *Wilmington* v. *Department of Pub. Utils.*, 340 Mass. 432 (1960), applied to election cases.

[3] Two other factors have prompted the United States Supreme Court to allow representational standing: (1) "the presence of some substantial relationship between the claimant and the third parties," and (2) "the need to avoid a dilution of third parties' constitutional rights that would result were the assertion of jus tertii not permitted." Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 425 (1974).

*supra* at §§ 3-21, 3-26.  The city recognizes that it must show injury and claims as its injury the fact that it has been deprived of the opportunity to have Initiative 11/81 become law.  The city contends that it will suffer adverse financial consequences without Initiative 11/81.  The flaw in the city's argument is that it assumes that if Initiative 11/81 appears on the ballot, the people will approve it.  "We cannot speculate as to the result of the election.  The question of the capacity of the plaintiffs to sue must be determined without regard to the provisions of the proposed measure if it should be adopted."  *Portland Gen. Elec. Co.* v. *Judd,* 184 Or. 386, 389 (1948).  Since the city's allegation of injury is insufficient, see L. Tribe, *supra* at §§ 3-21, 3-26; Note, Standing to Assert Constitutional Jus Tertii, *supra* at 429-430, Boston also lacks standing in a representative capacity.

*Specific appropriation.*  Article 48 of the Amendments to the Massachusetts Constitution provides that no law "that makes a specific appropriation of money from the treasury of the commonwealth shall be proposed by an initiative petition."  "To appropriate has been defined as 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other.'  *State* v. *Moore,* 50 Neb. 88, at page 96 [1896], quoted in *Hunt* v. *Callaghan,* 32 Ariz. 235, 239 [1927], and in *State* v. *Dammann,* 220 Wis. 143, 148 [1936]."  *Opinion of the Justices,* 323 Mass. 764, 766 (1948).  "Permanently to lay hold of and appropriate to a single public use all the revenue derived from one source of taxation we think is a 'specific appropriation.'"  *Opinion of the Justices,* 297 Mass. 577, 581 (1937).[4]

---

[4] Bills setting up insurance funds are not specific appropriations excluded from the initiative by art. 48.  In *Horton* v. *Attorney Gen.,* 269 Mass. 503, 512 (1929), we held that an act that created an insurance fund to compensate victims of automobile accidents was not a specific appropriation.  The act did not appropriate tax money collected by the Commonwealth and placed in the treasury.  Similarly, the Justices advised the Legislature that a bill establishing workmen's compensation is not an ap-

The plaintiffs assert that Initiative 11/81 is not a specific appropriation, because a specific appropriation must devote a specific amount of money to a particular purpose. Since Initiative 11/81 does not set aside a definite sum for any one use, the plaintiffs argue that it is not a specific appropriation. We disagree.

A specific appropriation need not be a definite sum of money. See *Opinion of the Justices*, 297 Mass. 577, 580 (1937). In that opinion, the Justices concluded that proposed legislation restricting the use of certain revenues from motor vehicle registration fees, licenses and gasoline excise fees to highway purposes was a specific appropriation, although it did not provide a fixed sum. "Its direct purpose is to seize upon all the revenue received from the designated sources and to appropriate it permanently to a specified public use." *Id.*

Moreover, "the word 'specific' [in art. 48] was not intended to be interpreted in any narrow or constricted sense." *Id.* If "the funds are separated from the treasury of the state and from the control of the legislature, and paid over to executive or quasi-executive bodies at the local level," that is "the essence of an appropriation." Stewart, The Law of Initiative Referendum in Massachusetts, 12 New England L. Rev. 455, 465 (1977). See *County Rd. Comm'rs* v. *Canvassers*, 391 Mich. 666, 672-673 & n.8 (1974); *Heinkel* v. *Toberman*, 360 Mo. 58 (1950); *State ex rel. Haynes* v. *District Court*, 106 Mont. 470 (1938). Initiative 11/81 sets aside money from the Commonwealth's treasury and places it in local personal income tax and local sales and use tax funds

propriation. *Opinion of the Justices*, 309 Mass. 571 (1941). "The proposed law does not contemplate that the expenditure of any revenue of the Commonwealth derived directly or indirectly from taxation shall be used for its purposes without further appropriation. And it nowhere provides for payment into the State insurance fund of money raised by taxation. It contemplates that compensation benefits . . . shall be paid out of the fund, and that this fund shall consist of premiums paid by employers for workmen's compensation insurance . . . ." *Id.* at 583. Initiative 11/81 is distinguishable from these bills. Instead of collecting insurance premiums and paying out benefits from a special fund, Initiative 11/81 allocates tax money from the general treasury to the cities and towns.

for cities and towns to use as they choose. Hence, it is a specific appropriation.

The plaintiffs also argue that because local governments must approve each spending decision before the money can be disbursed, it is not a specific appropriation.[5] Although further appropriation by the municipalities is required, the funds are still removed from the control of the Legislature. Hence, Initiative 11/81 embodies the "essence of an appropriation."[6] Stewart, *supra* at 465.

Our conclusion is consistent with the principal reason for excluding appropriations from the initiative.[7] "[A]n appropriation by the people of specific sums of money would knock spots, if I may use a slang expression, out of any State budget, and prevent any real regulation and careful administration of the finances of the State." 2 Debates in the Massachusetts Constitutional Convention of 1917-1918, at 828-829 (1918).

---

[5] The plaintiffs claim that Initiative 11/81 is not a specific appropriation, because it distributes funds to cities and towns which then appropriate the money. In making this argument, they rely on *Opinion of the Justices*, 300 Mass. 630 (1938), in which the Justices advised the Legislature that a bill directing $8,000,000 to the cities and towns for highway purposes was an appropriation under art. 63 of the Amendments to the Massachusetts Constitution. We distinguished that bill from a measure that distributed money to municipalities to use as they chose.

This 1938 opinion is not authority for the proposition that a distribution of funds for cities and towns is not an appropriation. In that opinion, the Justices reserved decision on that issue. "To what extent and in what circumstances this principle may render art. 63 of the Amendments [governing the appropriation process] inapplicable to a statute providing for a payment of money from the treasury of the Commonwealth need not be considered at large." *Id.* at 638.

[6] If Initiative 11/81 were not viewed as a specific appropriation, further initiatives might ultimately remove the allocation of all tax money from the control of the Legislature.

[7] There is another reason for the appropriation exclusion of art. 48. At the Constitutional Convention of 1917-1918, Mr. Luce of Waltham termed this appropriation exclusion "the amendment against demagogues . . . aimed at the men who would hoist themselves into public office by pledging their influence in order that this or that species of property may be transferred from one man's pocket to another's." 2 Debates in the Massachusetts Constitutional Convention of 1917-1918, at 816 (1918).