Jay HESSEY, Appellant,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
et al., Appellees.

Gottlieb SIMON, Appellant,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
et al., Appellees.

Nos. 90–680, 90–809.

District of Columbia Court of Appeals.

Argued en banc May 8, 1991.
Decided Nov. 22, 1991.

---

Carol R. Golubock, with whom Katherine A. Meyer, Washington, D.C., was on the brief, for appellant in No. 90–680.

Cornish F. Hitchcock, with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellant in No. 90–809.

William H. Lewis, with whom Alice P. McCrory, Washington, D.C., was on the brief, for appellee, the District of Columbia Board of Elections and Ethics.

Vincent Mark J. Policy, Washington, D.C., for intervenor-appellees James Durham, Kenneth Price, the Apartment and Office Bldg. Ass'n of Metropolitan Washington, and the Washington, D.C. Ass'n of Realtors, Inc.

Before ROGERS, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, and WAGNER, Associate Judges, and BELSON,* Senior Judge.

On Rehearing En Banc

ROGERS, Chief Judge:

Before the en banc court for the first time in a decade is the question of the scope of the right of initiative.[1] D.C.Code § 1–281(a) (1987 Repl.). The issue arises in the context of two proposed initiatives that would impose fees or tax surcharges to be deposited in trust funds devoted to low and moderate income housing purposes. The question before the court is whether these initiatives fall within the prohibition of "laws appropriating funds" contained in D.C.Code § 1–281(a) (1987 Repl.) or other limitation on the initiative right. The fundamental underlying question, however, is who is to be in charge of the District government's local financial management, the District's elected officials or the electorate by initiative. The answer necessarily requires consideration of the unique role of the Mayor and Council of the District of Columbia in the budget and financial management of the District government.

Part I of this opinion describes the proposed initiatives and four approaches for determining whether the proposed measures are proper subjects for initiatives. Part II describes the District government's budget process and financial management responsibilities. Part III reviews the creation of the initiative right and limitations on that right. Part IV examines the proposed initiatives in light of the interpretation that is most consistent with the District government's unique fiscal status.

We conclude that the right of initiative does not extend to initiatives, such as the ones here, which would allocate District government revenues. While the initiative right to authorize is broad, the limitation inheres in the unique budget process and the financial management scheme of the District government. Accordingly, we affirm the judgments of the trial court declining to order the District of Columbia Board of Elections and Ethics to accept these measures for inclusion on the ballot.

I.

Each initiative contains linkage provisions between large commercial develop-

---

* Judge Belson was an Associate Judge of the court at the time of argument. He was commissioned as a Senior Judge on July 24, 1991.

1. The en banc court last considered the scope of the initiative right in *Convention Center Referendum Comm. v. District of Columbia Bd. of Elections & Ethics*, 441 A.2d 889 (D.C.1981) (en banc) (hereinafter *Convention Center II*).

ments and funding low and moderate income housing programs. The "Affordable Housing Act" initiative, Appeal No. 90–680, would require developers of office buildings of 50,000 square feet or more to construct or rehabilitate housing for lower or moderate income families or to contribute funds for that purpose. The collected funds would be deposited in a trust fund created by the initiative, to be used exclusively for the construction of low income housing.

The "Housing Now! Act of 1990" initiative, Appeal No. 90–809, would amend D.C.Code § 47–813 (1990) to impose a surcharge on commercial properties of 50,000 or more square feet. The initiative would require an amount equal to the surcharge to be deposited in the Housing Production Trust Fund, an existing special fund established by the Council, D.C.Code §§ 45–3101 to –3104 (1990).

The Board of Elections, acting pursuant to D.C.Code § 1–1320(b)(1) (1987), refused to accept the proposed initiatives for filing. The Board found that the Affordable Housing Initiative, by restricting the monies in the fund to a specific purpose, nullified the discretion of the Council and the Mayor, and that the initiative, therefore, was an attempt to "launch the appropriations process contrary to the holding in *Convention Center II, supra* note 1." Adopting the same reasoning, the Board found that the Housing Now! Act of 1990 initiative would limit the discretion of the Council to spend the monies for purposes unrelated to housing (even though by the terms of the Housing Production Trust Fund the Council could choose among nine distinct housing categories, *see* D.C.Code § 45–3102).

In separate actions filed pursuant to D.C.Code § 1–1320(b) (1987), the proponents of the initiatives sought to have the Superior Court of the District of Columbia direct the Board to accept the measures and place them on the ballot as initiatives. Summary judgment was granted in both cases for the Board of Elections and inter-

venors James Durham, Kenneth Price, the Apartment and Office Building Association of Metropolitan Washington, and the Washington, D.C. Association of Realtors.

On appeal it is argued, on the one hand, by appellant that the measures are proper subjects for initiatives since they are not Budget Request Acts and do not affect the authority of the Council of the District of Columbia to allocate revenues among authorized programs and activities in the process of enacting a Budget Request Act for approval by Congress. Rather, the argument continues, the proposed initiatives simply authorize the collection of new revenues and only limit the Council's revenue allocation role to the extent that the initiatives would require the Council, if it wanted to use the new revenues, to use them for the particular purpose or program specified by the initiatives. In other words, no revenues from the new tax surcharge and fees could be spent for these programs (absent Congressional action) unless first allocated by the Council in a Budget Request Act.

Taking a contrary view, intervenors and the Board argue that any restriction on the Council's power to allocate revenues interferes with responsible financial management and runs afoul of the "laws appropriating funds" limitation. This conclusion is required, intervenors argue, in order to assure that the legislature, and only the legislature—whether Congress or the Council—retains "control over the allocation of initiative-generated revenues among competing needs." Therefore, this view concludes that in addition to the prior holdings of the court on the nature of limitations on the right of initiative:

> An initiative which attempts to impose, by the terms of the initiated law, a legal constraint (either by mandate or by prohibition) on the Council's authority to allocate revenues among competing programs or other uses in the normal budget process, or which attempts itself to exercise that authority, is prohibited.[2]

**2.** This approach rejects, as do we, the notion that the Council's ability to amend an initiative, *see Atchison v. District of Columbia,* 585 A.2d

150, 155 (D.C.1990), prevents it from being prohibited. Our previous decisions have not

Accordingly, the court is presented with a question of statutory interpretation, *see Convention Center II, supra* note 1, 441 A.2d at 911, in which the precise issue is whether a citizen initiative can have any revenue allocation role, either in the Budget Request Act process or by placing restrictions on the use by the Council of available revenues through deposits in special funds. This is a question of first impression. How one answers the question depends on how the initiative right in D.C.Code § 1–281(a) (1987 Repl.) is construed. That section defines an initiative as:

> the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws direct to the registered qualified electors for their approval or disapproval.

If an initiative is adopted by a majority of the registered, qualified electors voting, then the initiative, upon certification of the vote by the District of Columbia Board of Elections and Ethics, becomes an act of the Council subject to the congressional review period of D.C.Code § 1–233(c). D.C.Code § 1–285.

 An amendment to the Charter, such as the right of initiative, cannot be viewed in a vacuum, but must be construed in light of the statutory scheme established by the Charter in the District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), (codified as amended in scattered sections of the D.C.Code) (Self–Government Act). *Id.; Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc). Since amendments to the Charter required Congressional approval when the initiative right was approved by Congress, D.C.Code § 1–1320 (1991 Repl.), the court must consider Congressional intent in approving the amendment. Because the Charter amendment is in the form of an act passed by the Council, and because the Charter Amendment on the right of initiative included authority for the Council to adopt imple-

menting legislation, the court must address the intent of the Council. Given this framework, several interpretations of the initiative right emerge.

One interpretation is that the initiative right extends to anything other than a Budget Request Act. *Convention Center II, supra* note 1, 441 A.2d at 925 (Gallagher, J., dissenting). This interpretation takes a very broad view of the initiative right, and has the merit of simplicity and ease of application.

A second interpretation focuses on whether an initiative forces the Council to allocate funds as a result of the enactment of the initiative. Under this by-pass interpretation, if there is nothing for the Council to do other than allocate revenues to carry out the initiative, the measure runs afoul of the "laws appropriating funds" limitation. But if there remains, after the initiative becomes effective, the requirement of an allocation of revenues at the discretion of the Council, the measure would be a proper subject for initiative. This by-pass of the regular budget process approach, urged by appellants, is followed by the Alaska Supreme Court in *McAlpine v. University of Alaska,* 762 P.2d 81, 91 (Alaska 1988), and the Montana Supreme Court in *State ex rel. Haynes v. District Court,* 106 Mont. 470, 475–79, 78 P.2d 937, 941–42 (1938).

A third interpretation, adopted by a three-judge plurality in *Convention Center II,* is that the "laws appropriating funds" limitation "prevents the electorate from using the initiative to (1) adopt a Budget Request Act or make some other affirmative effort to appropriate funds, or to (2) block the expenditure of funds requested or appropriated as of the effective date of the initiative act." 441 A.2d at 913. Although the plurality did not define "other affirmative effort," it noted that the Council "was particularly concerned . . . that the electorate not use the initiative to launch the appropriations process." *Id.* at 912. This interpretation of the initiative right is consistent with balancing the competing purposes of having a broad right of initia-

---

viewed the amending power as saving an other- wise prohibited initiative.

tive without sacrificing sound financial management. *Id.* However, it has not always been easy to apply. *Compare Convention Center II, supra* note 1, 441 A.2d 889, and *District of Columbia v. Jones,* 481 A.2d 456 (D.C.1984) (increased unemployment benefits initiative), *with District of Columbia Bd. of Elections & Ethics v. District of Columbia,* 520 A.2d 671 (D.C. 1986) (overnight shelter initiative).

A fourth interpretation equates "laws appropriating funds" with "laws apportioning funds." Thus, any measure which seeks to "segregate public moneys or a part of the public revenue to any narrow purpose" is not a proper subject for an initiative. *In re Opinion of Justices,* 297 Mass. 577, 580, 9 N.E.2d 186, 188 (1937) (interpreting state constitutional provision prohibiting an initiative that "makes a specific appropriation of money from the treasury"). The rationale of this interpretation, urged by intervenors, derives from the intent of the state constitution or charter to "centralize the financial affairs of the [jurisdiction] in its own treasury and place responsibility for their control in the [legislature]." *Id.* at 580, 9 N.E.2d at 188. Like the first interpretation, this interpretation benefits from simplicity. By contrast with the first interpretation, however, it is a more restrictive interpretation of the initiative right for it leaves control over financial management, including revenue allocation, within the sole discretion of the legislature (subject to executive veto).

To determine which interpretation of the initiative right is most consistent with legislative intent in approving a right of initiative in the District of Columbia requires an examination of the District government's unique budget process and its financial management policies.

## II.

Under the Self–Government Act, Congress retains the power to appropriate all District government revenues. D.C.Code § 47–304 (1990).[3] The Self–Government Act provides that the Council of the District of Columbia is the local legislature, subject to the power of Congress under article I, section 8, clause 17 of the U.S. Constitution to enact legislation for the District of Columbia. D.C.Code §§ 1–204, –206. While granting self-government to District residents, and "consistent with the constitutional mandate, to relieve Congress of the burden of legislating upon essentially local District matters," D.C.Code § 1–201(a), Congress limited the Council's power to enact legislation in three major respects. First, no legislation enacted by the Council, other than a temporary 90–day emergency act, may take effect until it has been presented to Congress for a prescribed period of time to consider whether or not to disapprove the legislation.[4] D.C.Code § 1–233(c). Second, specific subject areas are excluded from the Council's legislative authority. D.C.Code § 1–233(a) & (b). Third, and relevant here, the Council cannot authorize the spending of local revenues; only Congress can.[5] D.C.Code § 47–304.[6]

**3.** D.C.Code § 47–304 provides in pertinent part that

> no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by act of Congress, and then only according to such act.

Further restrictions appear in D.C.Code § 47–305, including that:

> No employee shall be hired on a full-time or part-time basis unless such position is authorized by act of Congress. Employees shall be assigned in accordance with the program, organization, and fund categories specified in the act of Congress authorizing such position.

**4.** *See Alston v. United States,* 580 A.2d 587, 590 (D.C.1990).

**5.** There are certain exceptions associated with bonds and notes which are not relevant here.

**6.** *See also* D.C.Code § 47–313 (1990 Repl.), which provides:

> (a) Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

The legislative history of the Self–Government Act makes clear that the Self–Government Act left in place the pre-existing Congressional ap-

The Self–Government Act, however, provides roles for the Mayor and the Council in the District's budget process. The Charter, title IV of the Act, prescribes the procedure by which the Mayor and the Council shall annually submit a budget request to the President for submission to Congress for approval. D.C.Code §§ 47–301, –304. The Mayor is required to prepare and submit to the Council an annual budget that "specif[ies] the agencies and [the] purposes for which funds are being requested; and ... shall be prepared on the assumption that [the] proposed expenditures ... for such fiscal year shall not exceed estimated resources from existing sources and proposed sources." D.C.Code § 47–301(a)(1). The Mayor's annual budget must include, in addition, a number of reports, such as multiyear plans for operating and capital expenditures, and program performance and issues reports. Id. § 47–301(a)(3)–(6).[7] The Council, in turn, is required to adopt by act the annual budget within 50 days of receiving the Mayor's budget proposal. Id. § 47–304.[8] The Mayor may disapprove "any item or provision" of the Council's Budget Request Act, subject to override by two-thirds of the Council. Id. § 1–227(e) (1987 Repl.). The final product, the District's budget request, is required to be a balanced budget, with proposed expenditures not exceeding existing and proposed revenues in the fiscal year. D.C.Code § 47–313(c) & (d).[9] Hence, by direction of the Charter, the Mayor's annual budget proposal and the Council's Budget Request Act perform the function of forcing the locally elected officials to determine how they want Congress to authorize the spending of government revenues among competing programs and activities in a fiscal year.

As between the Mayor and the Council, therefore, the Budget Request Act is an important document. Upon its enactment, moreover, the Mayor is required to support the Budget Request Act when the District's budget is pending before the President, under review by the office of Management and Budget, and also before Congress, after the President has submitted a budget request on behalf of the District government for approval by Congress. D.C.Code §§ 47–304, –313(d). It is also an important document beyond the District government, notwithstanding Congressional line-by-line review of the District's budget request by the Congressional Appropriations Subcommittees on the District of Columbia.[10] The Budget Request Act sets the baseline for Congressional review, and in view of Congressional commitment to self government, see D.C.Code § 1–201(a), the restructuring of the proposed allocation of revenues may often be substantially in accord with that proposed in the Budget Request Act.[11] Consequent-

---

propriations process for the District government. HOUSE COMMITTEE ON THE DISTRICT OF COLUMBIA, 93 CONG., 2D SESS., HOME RULE FOR THE DISTRICT OF COLUMBIA, 1973–1974, BACKGROUND AND LEGISLATIVE HISTORY OF H.R. 9056, H.R. 9682, AND RELATED BILLS, at 3016 (Comm.Print 1974) (HOME RULE HISTORY) (referring to Joint Explanatory Statement of the Committee of the Conference).

7. The Mayor is also required to prepare studies in connection with submission of the Mayor's proposal for the annual amount of the federal payment. D.C.Code § 47–3405.

8. The procedure by which the Council adopts an act is contained elsewhere in title IV of the Self–Government Act. See D.C.Code § 1–227(e) (procedure by which "acts" of Council are enacted); id., § 1–229(a) (Council discharges its duties by passage of acts and resolutions); id., § 1–227, Rules of Procedure of the Council of the District of Columbia, art. VII, §§ 701–707 (1990 Supp.) (Mayor's budget proposal is introduced as a budget request and the final action of the Council is in the form of a Budget Request Act).

9. An exception is provided for the budget request of the District of Columbia Courts. D.C.Code § 47–313(c).

10. HOME RULE HISTORY, supra note 6, at 3060 (Congress retains "the right to review and to appropriate the entire District budget, approving of the necessary Federal payment and passing upon all reprogramming requests.") (remarks of Congressman Natcher, Chairman of House Appropriations Committee Subcommittee on the District of Columbia, to the House of Representatives on the Conference Report).

11. Experience suggests that the Congress is likely to approve much of the District government's proposal in the Budget Request Act, while exercising the right to modify some requests and add restrictions not sought by the District government. See, e.g., District of Columbia Ap-

ly, the Budget Request Act process is vitally important from the perspective of the elected officials of the District government, and the electorate, precisely because the process represents the District government's power of the purse.

In addition, Congress, while retaining in the Self–Government Act the pre-home rule procedures for presidential review and submission for approval to Congress of the District's budget, D.C.Code § 47–313(a), also contemplated that the financial management system for the District government would be improved with self-government.[12] The provisions in the Charter set forth with particularity the budget process and financial policies for the District of Columbia. Beyond requiring the Mayor and the Council to identify expenses and revenues and to propose a balanced budget for Congressional approval, the Charter includes standards for budget execution, requiring consistency between budget, accounting and personnel systems, and two separate audits by the Office of the District of Columbia Auditor and the Mayor. D.C.Code §§ 47–117(b) –312(4).[13]

These provisions, consolidating local financial controls, were forecast in the Report of the Commission on the Organization of the Government of the District of Columbia submitted to Congress shortly before enactment of the Self–Government Act. *See* note 12, *supra.* Furthermore, with regard to District government revenues, the Charter Act places specific financial responsibilities in the Mayor for the management and accounting of all District government revenues. D.C.Code § 47–310.[14] The annual appropriations acts passed by Congress also direct the Mayor to submit to the Council, in advance of submission of the budget proposal for the forthcoming fiscal year, a report on all available revenues.[15]

Of significance to the instant appeals, the Charter places the authority over the establishment of special revenue funds in the Council. The Charter defines the general fund of the District government as consisting of all District government revenues other than those "applied by law to any special fund existing on December 24, 1973." D.C.Code § 47–130.[16] It provides

---

propriations Act, 1991, Pub.L. No. 101–518, §§ 101–136, 104 Stat. 2224, 2233–37 (1990).

**12.** Home Rule History, *supra* note 6, at 3056–57. *See also* D.C.Code § 1–201(b) (intent to implement commission recommendations); Report of the Commission on the Organization of the Government of the District of Columbia, 92nd Cong., 2d Sess. (House Document 92–317) (August 17, 1972) vol. I, xvi & Chap. VI, pp. 447 ff (recommending stronger District government wide controls over budget and fund control in pre-home rule government)

**13.** Two additional audits are required by other statutes. Pub.L. 97–258, §§ 1, 96 Stat. 877 (Sept. 13, 1982); Pub.L. 94–399, § 4 (Sept. 4, 1976). Pursuant to D.C.Code § 47–118.1, the Comptroller General of the United States is required each year to audit the accounts and operations of the District government. Under D.C.Code § 47–119, the District government is required to hire an accounting firm to conduct an independent annual audit, with copies of the audit to Congress, the President, the Council, and the Comptroller General.

**14.** D.C.Code § 47–310 provides, in part:
(a) Subject to the limitation of § 47–313 [no change in federal process regarding District's budget; borrowing and spending limitations], the Mayor shall have charge of the adminis-

tration of the financial affairs of the District and to that end he [or she] shall:
(1) Supervise and be responsible for all financial transactions to insure adequate control of revenues and resources and to insure that appropriations are not exceeded;
(2) Maintain systems of accounting and internal control designed to provide:
(A) full disclosure of the financial results of the District government's activities;
(B) Adequate financial information needed by the District government for management purposes;
(C) Effective control over and accountability for all funds, property, and other assets;
(D) Reliable accounting results to serve as the basis for preparing and supporting agency budget requests and controlling the execution the budget;

**15.** *See, e.g.,* District of Columbia Appropriations Act, 1991, Pub.L. No. 101–518, § 128, 104 Stat. 2224, 2236 (1990); District of Columbia Appropriations Act, 1990, Pub.L. No. 101–168, § 128, 103 Stat. 1267, 1279 (1989); District of Columbia Appropriations Act, 1989, Pub.L. No. 100–462, § 128, 102 Stat. 2269, 2269–11 (1988); District of Columbia Appropriations Act of 1988, Pub.L. No. 100–202, sec. 1(c), § 128, 101 Stat. 1329–90, 1329–101 (1987).

**16.** D.C.Code § 1–202 (1987 Repl.) defines "District revenues" to mean "all funds received from

that the "Council ... may establish such additional special funds as may be necessary for the efficient operation of the government of the District." *Id.*[17] The Charter provision thus places a special responsibility in the Council with respect to special funds. In vesting the Council with the decision whether special funds are necessary, Congress required that a determination be made that such funds would advance governmental efficiency. Such a decision could be difficult for the electorate to make. As was observed in *State ex rel. Keefe v. St. Petersburg*, 106 Fla. 742, 144 So. 313, 144 So. 671, 145 So. 175 (1933) (en banc):

> A budget system means sound fiscal management of municipal affairs, by requiring all expenditures, through appropriations, to be predicated on a proper understanding and appreciation of all the pertinent facts.... [The statutory right of initiative] could not have intended to embrace those matters of financial management, which, while legislative in their character, are such as are impliedly, if not expressly, required by the charter

to be dealt with by the city's responsible officers on the basis of peculiar and special knowledge possessed by them concerning the possible resources of the city, and the necessities required to be met through the exercise of the delegated power of taxation.

145 So. at 176 (citations omitted).[18]

Accordingly, in vesting the Mayor and Council with control over the local budget process, and vesting the Council with responsibility for the establishment of special funds, Congress has assigned responsibility for the proper allocation of District government revenues to the District government's elected officials. With this background, we turn to the initiative right.

### III.

Following the effective date of the Self–Government Act, the Council began a process by which its power to legislate could extend beyond the thirteen elected members of the Council and the elected Mayor to the citizens of the District of Columbia.[19] The bill, introduced in the Council on July 3, 1977, proposed that the electors of the

---

taxes, fees, charges, and miscellaneous receipts, including all annual federal payments to the District authorized by law, and from the sale of bonds." The notes to D.C.Code § 47–130 state that the definitions in § 1–202 apply.

**17.** Pursuant to legislation passed by the Council, the Council also is authorized to establish "accounts within the General Fund," in which expenditures and revenues for "individual programs and activities" are separately maintained. D.C.Code § 47–131(b).

**18.** *See Cuprowski v. City of Jersey City*, 101 N.J.Super. 15, 242 A.2d 873 (1968), where the court stated:

No proponent of initiative or referendum would maintain that all municipal activity should be subject to popular election. If governments are to function there must be some area in which representative action will be final. In many situations it is difficult to determine how far the limitations should go. The courts must draw the line in these situations and in doing so must balance two interests—the protections of the city government from harassment as against the benefits of direct legislation by the people.

An essential function of a governing body is the management of the financial affairs of the municipal government, which involves the fixing of a budget to be used as the basis for

determining the amount and rate of taxes to be levied.

It is fundamental that to permit a referendum which might annul or delay executive action would destroy the efficiency necessary for the successful administration of the affairs of the municipality.

101 N.J.Super. at 24–25, 242 A.2d at 878 (citations omitted).

**19.** *See* Initiative, Referendum and Recall Charter Amendments: Hearings on H.R.Con.Res. 471 & 464 Before the House District of Columbia Committee, 95th Cong.2d Sess., at 2 (1978) (statement of Honorable Hilda Howland Mason before the House District of Columbia Committee) ("the Initiative and Referendum Charter Amendments would supplement the present legislative process and allow the public to express its sentiments directly and make those sentiments public policy.); Julius Hobson, Council of the District of Columbia, Memorandum on The Initiative and Referendum Act at 1, 3 (Jan. 3, 1977) ("The only means through which the people [sic] of the District of Columbia can participate directly in their government is through the initiative and referendum process. * * * [The] ... amendment would supplement the present legislative process and allow the electorate to voice directly its sentiments and make that sentiment public policy").

District of Columbia have the right of initiative, referendum and recall.[20] The Council was thereby proposing a further limitation on its legislative powers since a law passed by the electorate would, presumably, have sufficient popular support to cause an elected member of the Council to pause before attempting to repeal it.[21]

The right of initiative was established pursuant to an act of the Council that called for an amendment to the Charter in the Self–Government Act. Initiative, Referendum and Recall Charter Amendments Act of 1977, D.C.Law 2–46, Sec. 2, § 1(a), 24 D.C.Reg. 199 (1978) (codified at D.C.Code § 1–281(a) (1987)). Following ratification by a majority of the registered qualified electors on November 7, 1977, Congress approved the amendment to the Charter. H.R.Res.Con. 464, 92 Stat. 3868 (1978). As originally proposed, the right of initiative was virtually unlimited. *See* Council Bill No. 2–2, *supra* note 20. However, before becoming effective, this changed. The first limitation relevant here was part of the Charter Amendments Act passed by the Council, and thereafter ratified by the electorate and approved by the Congress. The other two which are relevant here are part of the act passed by the Council to implement the Charter Amendments Act.

### A.

*"Laws appropriating funds."* While leaving a very broad right of initiative with regard to the authorization of programs and activities, the Council determined that initiatives could not include "laws appropriating funds." D.C.Code § 1–281(a) (1987)). The debate in the Council on the Charter Amendments legislation focused, to the ex-

tent pertinent here, on confining the initiative power to the authorization of programs and activities as distinct from the Council's power with regard to the allocation of revenues in the budget process.[22] When Chairman Dixon introduced the "laws appropriating funds" provision he stated that it would "prohibit initiative[s] used against or *as related to* appropriated funds which go to tax levying *and* other forms of operating budget or appropriated fund actions." *Convention Center II, supra* note 1, 441 A.2d at 911 (emphasis added). Further explanation of the effect of the limitation indicated that it was designed to prohibit use of the initiative for "appropriations." *Id.* at 934.

The clearest expression in this legislative history by members of the Council regarding the effect of the "laws appropriating funds" limitation appears during a colloquy between the chairman of the Council (Dixon) and the chairman of the Council's Committee on Finance and Revenue (Barry). *See* note 22, *supra.* Distinguishing between the right by initiative to authorize the establishment of a new office with specific duties and the authorization of appropriations for the office to carry out its duties, Councilmember Barry stated that the citizens by initiative could create an Office of Latino Affairs but could not also fund it. Once a program or activity was authorized, it was for the Council initially to determine in the budget process whether and what amount of revenue would be dedicated to that program or activity. Chairman Dixon agreed, stating that "The electorate can initiate a tax if they want to, but they cannot appropriate that money. They can initiate any measure they want to initiate but they cannot initiate the spend-

---

20. Bill 2–2, introduced by Councilmember Julius W. Hobson on January 3, 1977, originally called for an amendment to the Home Rule Charter and defined an initiative as "the power of the electors of the District of Columbia to propose legislation and refer such legislative directly to the electorate to pass or reject the same."

21. In *Atchison v. District of Columbia, supra* note 2, 585 A.2d at 155, the court upheld the

power of the D.C. Council to repeal or substantially amend an act passed by initiative. *See Convention Center II, supra* note 1, 441 A.2d at 935 n. 12.

22. The debate is reprinted, in part, in the plurality opinion and the appendix to the dissenting opinion in *Convention Center II, supra* note 1, 441 A.2d at 911–12, 931–36.

ing of that money." *Id.* at 912.[23] He also remarked that the decision to authorize a project was distinct from the decisions by Congress to appropriate and by the Council "*to set aside.*" *Id.* at 932 n. 4 (emphasis added).

Although the debate of the Council did not address the precise issue in the instant appeals, it sheds some light on the Council's understanding that the proposed Charter amendment to allow initiatives did not extend to the budget process. *Id.* at 932 n. 3. The colloquy makes clear that the proponent of the "laws appropriating funds" limitation contemplated that new sources of revenue could be identified by initiative, but that only the Council could decide how those revenues would be allocated. Interestingly, during the debate, Councilmember Clarke raised the question whether an initiative that would have a fiscal impact could be required to include a source of funding, by "special tax levy to raise funds for the project or program proposed," and if so, whether a court could order the Council to use the revenues raised for that purpose and provide more if those revenues raised by the initiative proved insufficient to carry out the initiative. *Id.* at 935 n. 10. Chairman Dixon appeared to agree that it was possible for an initiative to include a funding source and that, in any event, the District government could be sued if it failed to carry out the initiative even if it had not identified funding. *Id.* The focus of the debate at this point, however, was on the possibility that an initiative would result in an unbalanced budget or a deficit, and the Council appears to have concluded that this problem would be avoided with the "laws appropriating funds" limitation because the Council would determine how revenues would be allocated. *Id.* at 935.

Following up on the distinction between authorization and allocation of revenues, Councilmember Barry's remarks also indicate that he viewed the initiative right compatible with funds being identified in an initiative so long as the final decision about allocating funds was the Council's. *Id.* at 932 n. 3. His position arose from concern that an unlimited right of initiative had the potential to intrude upon proper financial management if an initiative could force the Council to allocate revenues. *Id.* at 931 n. 1.

Congressman Fauntroy echoed this refrain in explaining to the U.S. House of Representatives that House Concurrent Resolution 436, to approve the Charter Amendments Act, "relates to [the] initiative [right] which is the process that allows electors to propose laws which will be voted on by them. This process of course excludes laws *relating to* the appropriation of funds." *Id.* at 912 (emphasis added).

---

**23.** This interpretation is also reflected in the correspondence between the staff director of the Government Operations Committee, and the General Counsel of the Council. Referring specifically to the "laws appropriating funds" exception, the staff director stated that

the only limitation upon the electors' rights is in the direct appropriation of funds. This exemption was included in light of the unique nature of the District's budgetary appropriations process. I do concur, that insofar as the approval of specific capital projects is contained within a multi-year capital budget act, that action thereupon is precluded. However, I do believe that an initiative would be appropriate, for example, to call for the construction of an expanded subway system, a school, etc. Funding would then, of course, be dependent upon other legislative routes.

Referring to the debate of the members of the Government Operations Committee on the initiative proposal, the staff director stated that: [t]he debate is clear that the initiative is to be only viewed as an authorization measure and not an appropriation matter. * * * The example of the Committee's action in reporting the Latino Community act with a price tag of $200,000, and the Congress' approval of $50,-000+ is noted.

BRUCE FRENCH, STAFF DIRECTOR, COMMITTEE ON GOVERNMENT OPERATIONS, DISTRICT OF COLUMBIA COUNCIL, BILL 2–2, INITIATIVE, REFERENDUM AND RECALL CHARTER AMENDMENTS ACT of 1977, at 2 (June 8, 1977) (FRENCH).

In his earlier memorandum to the Government Operations staff director, the General Counsel of the Council stated that

the [laws appropriating funds] language indicates that the Council excluded specifically the appropriation or budgetary authorization category, [but] I believe that this exemption would extend also to any matter or requirement mandated by the appropriation legislation.

EDWARD B. WEBB. JR., GENERAL COUNSEL OF THE DISTRICT OF COLUMBIA COUNCIL, BILL 2–2, INITIATIVE, REFERENDUM & RECALL CHARTER AMENDMENTS ACT OF 1977, at 1 (June 2, 1977). *See also* note 27, *infra.*

The "relating to" phrase suggests, again,—as does Chairman Dixon's reference to "other forms of operating budget or appropriated fund actions"—that more was contemplated by the "laws appropriating funds" limitation than simply prohibiting the electors from proposing Budget Request Acts.[24] To be consistent with the Council debate, the phrases would extend to the budget process.

### B.

*Title IV (the Charter)*. As required by the Charter Amendments Act, *see* D.C.Code § 1–287, following Congressional approval of the Charter Amendment authorizing initiatives, the Council enacted the Initiative Procedures Act. D.C.Code § 1–1320 (1987 Repl.). In so doing, the Council interpreted the Congressionally-approved initiative right to encompass several limitations on that right. The limitations arose from the language of the initiative in the Charter Amendments Act and from the Charter itself. Thus, the Council directed the Board of Elections to refuse to accept a proposed initiative if the Board found that the proposed initiative "is not a proper subject for initiative ... under the terms of title IV of the District of Columbia Self–Government and Governmental Reorganization Act...." D.C.Code § 1–1320(b)(1) (1987 Repl.). The Board also could not accept a proposed initiative that would "negate or limit an act of the Council of the District of Columbia pursuant to § 47–304." *Id.* § 1–1320(b)(1)(D).

Title IV of the Self–Government Act (the Charter) establishes a tripartite form of government for the District of Columbia, with an elected Council and Mayor, and a judicial system established by Congress in 1971. In addition, title IV addresses the District's budget process as well as financial management policies and responsibilities and borrowing authority, bonds and notes, and the independent agencies. *See* scattered sections of 1 D.C.Code, & 47 D.C.Code. It establishes, in other words, the "means of governance of the District." D.C.Code § 1–203 (1987 Repl.).

While the court has yet to address the meaning of this limitation on the initiative right,[25] the language of § 1–1320(b)(1) suggests that the Council may have intended more than simply placing a restriction on direct amendments of the Charter. The language chosen by the Council is "under the terms of title IV." While the phrase is not precise, its meaning can only arise from the substantive provisions of title IV. Adopted to implement the Charter Amendments Act, the phrase could reasonably be interpreted to mean that an initiative is also prohibited if it would interfere with the responsibilities assigned to the Council by the Charter, such as the Council's revenue allocation role and control of special funds. Accordingly, by referring to title IV, the Council, accepting that the initiative right was no more extensive than its own powers, excluded from the initiative right matters that would purport to change the structure of government and the procedures and responsibilities assigned by the Charter. *See* 1 D.C.Code § 1–184. In other words, under § 1–1320(b)(1), an initiative, like an act of the Council, could not directly amend the Charter, and an initiative also could not interfere with the ability

---

**24.** *See also* District of Columbia Council Government Operations Committee, Report No. 1 on Bill 2–2, at 18 (1977) ("normal legislative process would be needed to appropriate funds for authorized measures"). Another amendment adopted by the Council Government Operations Committee, and subsequently adopted by the Council and electorate, prohibited referenda concerning tax levy acts and appropriations for the general operating budget. *See* note 26, *supra.*

**25.** A division of the court interpreted this limitation in a decision predating the decision of the en banc court in *Convention Center II, supra*

note 1. *Convention Center v. D.C. Bd. of Elec.,* 441 A.2d 871 (D.C.1980) *vacated* 441 A.2d 889 (1981) (*Convention Center I*). The division opinion looked to initiatives in other jurisdictions for guidance in defining where the line is to be drawn between executive or administrative and legislative action. *Id.* 441 A.2d at 874 (citing decisions and 5 E. McQuillan, Municipal Corporations, *16.55, at 213–14 (3d. rev. 3d. 1969)*). *See also Convention Center II, supra* note 1, 441 A.2d at 921 (Budget Request Act not a law that could be enacted by initiative) (concurring opinion of Judge Newman joined by then Chief Judge Pryor).

of the Council to carry out its responsibilities under the Charter.

### C.

*Negate or limit.* The Council, in addition, as part of the Initiative Procedures Act, interpreted the initiative right established by the Charter Amendments Act to prohibit an initiative that would "negate or limit" a Budget Request Act passed by the Council. Since an initiative could not be a law appropriating funds, it would reasonably follow that the electorate could not accomplish after the fact what it could not accomplish before the fact, namely, interference with the Council's discretionary allocation of revenues among competing programs and activities. Here again it would seem that the Council preserved its ultimate control, subject only to veto by the Mayor, over the allocation of revenues to be presented for Congressional approval. Just as the Mayor must support the Budget Request Act passed by the Council, so too, under § 1–1320(b)(1)(D) the Council intended that the District's electorate would be bound by the determination by the District government's elected officials of how revenues will be allocated, subject only to revision by the President and Congress. Thus, an initiative could not amend the allocation in a Budget Request Act, to require, for example, that additional revenues be devoted to housing or that all revenues from a particular source, new or old, be devoted to a specific purpose.

### D.

■ Viewed together, these limitations on the right of initiative reflect a decision, implicit if not explicit, by the Congress and the Council that the power of the purse which Congress had delegated to the District government in the Self–Government Act would remain with the elected officials of the District government and not be subject to control by the electorate through an initiative.[26] The Charter created a budget process and established financial policies designed to assure that the District government's fiscal affairs would be run effectively and efficiently on a sound financial basis, without deficit financing. *See* Part II, *supra.* The Council intended to retain its control of the local budget process under the Charter. By ratifying the Charter Amendments Act with the "laws appropriating funds" limitation, and in the absence of other amendments removing limitations on the right that arise from other provisions of the Charter, the electorate reaffirmed its commitment to the fiscal scheme that it had ratified following Congressional enactment of the Self–Government Act in 1973.

The words and the legislative history of the "laws appropriating funds" limitation, combined with the Council's implementation of the initiative right in the Initiative Procedures Act, evince the Council's acknowledgment of its initial and continuing financial responsibilities. Congress had made no change in them when it approved the Charter Amendments Act to allow initiatives. That history likewise reveals the Council's concern that matters relating to the local budget process would remain within the control of the Mayor and Council, and that initiatives not create deficits or interfere with the locally elected officials' decisions about how District government revenues should be spent. The broad right of initiative was balanced against the financial responsibilities of elected officials under the Charter. *See Convention Center II, supra* note 1, at 912 ("an unqualified initiative right would enable the electorate to interfere with the fiscal affairs of the District [referring to distinction between appropriation and authorization]"); *State ex rel. Keefe v. City of St. Petersburg, supra,* 145 So. at 175 ("To hold that the initiative and referendum provisions of the charter are applicable to the appropriation ordinances, would materially obstruct, if not entirely defeat, the purpose of having a budget system.").

---

**26.** This position also is reflected in the Council's interpretation of the right of referendum. D.C.Code § 1–281(b) (a referendum "may suspend acts of the Council ... (except emergency acts, acts levying taxes, or acts appropriating funds for the general obligation budget) until such acts have been presented to the ... [voters] ... for their approval or rejection").

## IV.

Accordingly we examine the four interpretations of the initiative right to determine which is most consistent with the District's unique fiscal scheme, Congressional expectations for improved financial management with self government, and the legislative intent of the Congress and Council in adopting and implementing the "laws appropriating funds" limitation on the initiative right. *See Convention Center II, supra* note 1, 441 A.2d at 911 (court's role in statutory interpretation). To construe the "laws appropriating funds" language literally would render the limitation meaningless since the Council is without power to enact "laws appropriating funds." [27] *See id.* at 911 (language is "ambiguous on its face"). Neither the Council nor the electors of the District of Columbia can overrule acts of Congress. See *supra*, note 27. Since the court must assume that the Council did not enact a meaningless provision, the phrase "laws appropriating funds" must be viewed as a qualification on the initiative right that extends beyond limitations placed on the Council's legislative powers under the Self–Government Act.[28]

## A.

As discussed in Part I, *supra*, the first interpretation views the initiative right to extend to any legislative action other than a Budget Request Act. This is unsatisfactory for two reasons. First, a Budget Request Act is not ordinary legislation under the Self–Government Act since it does not become effective pursuant to a Congressional review period set forth in D.C.Code § 1–233(c). The Council's power to enact legislation is limited to the enactment of "acts." D.C.Code § 1–229(a). Such "acts," which become effective after Congressional review (unless disapproved by Congress), D.C.Code §§ 1–227(e) & –233(c), do not include a Budget Request Act, which follows a very different procedure than ordinary legislation passed by the Council. D.C.Code §§ 1–227(f), 47–304, 47–313(a). The Charter Amendment provides that initiatives are subject to Congressional review in the same manner as ordinary Council legislation. 1 D.C.Code 270 (Sec. 5), codified at D.C.Code § 1–285. It necessarily follows that if the power of initiative is otherwise coextensive with the legislative power of the Council, in which acts become effective after a period of Congressional review pursuant to D.C.Code § 1–233(c), then the initiative cannot in-

27. D.C.Code § 1–281(a) defines "initiative" in terms of proposing "laws" while the Council of the District of Columbia, under the Self–Government Act, enacts "acts." Section 412 of the Self–Government Act (codified at D.C.Code § 1–229(a)). The legislative history of the Charter Amendments Act indicates that the choice of the term "laws" was deliberate, in order to distinguish between legislation passed by the Council and legislation passed by initiative.

The Staff Director of the D.C. Council Committee on Government Operations advised the General Counsel to the D.C. Council by memorandum of June 8, 1977, that the use of the word "laws" was deliberately chosen to "avoid any conflict with the term of art 'act' found in the Home Rule Act. Hence, 'laws' should fairly be read as meaning actions similar to enactment of acts of the Council when the electors of the District of Columbia adopt such legislation by its own vote." FRENCH, *supra* note 23, at 1.

The *initiative power regarding "laws" is co-extensive with the Council's power to pass "acts" except to the extent that the right of initiative is otherwise limited beyond limitations on the legislative authority of the D.C. Council. See Convention Center II, supra* note 1, 441 A.2d at 907.

Under the Self–Government Act it is clear the electorate by initiative would not have the same power as Congress to enact legislation for the District of Columbia. Congress has not delegated that power to the electorate or the Council.

28. Courts are to construe statutes in a way which presumes that the legislature has acted logically and reasonably. *See United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) ("statutes always have some purpose or object to accomplish"); *Peoples Drug Stores v. District of Columbia, supra*, 470 A.2d at 755 (court "look[s] beyond the ordinary meaning of word of a statute only where there are persuasive reasons for doing so"). *See also United States v. American Trucking Assn's*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940) ("even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words"). *Cf. Haney v. United States*, 473 A.2d 393, 395 (D.C.1984).

clude a Budget Request Act. *See* Part II, *supra.* Therefore, the "laws appropriating funds" limitation on the initiative right would be superfluous unless it applied to more than a Budget Request Act. Hence, the language of the limitation must refer, in some other manner, to the Council's role in the District government's budget process. Further, this interpretation does not take into account the financial responsibilities placed in the Council by the Charter, and thus would require the court to ignore Congressional expectations for improved financial management with self government. In addition, this interpretation suffers from the fact that almost any initiative could be framed in a way that it would not be in the form of a Budget Request Act.

 The second interpretation, the by-pass approach, which would result in the allocation of revenues for specific purposes by initiative but require further legislative action in order to appropriate (*i.e.*, spend) those revenues, is not easily applied where the allocation and appropriation functions are divided between two legislatures, as in the District of Columbia. Congress has retained a tight rein on District government spending, itself making the ultimate decision in annual appropriations acts. *See* Part II, *supra.* Congress also has assigned to the elected officials of the District government, in order to improve financial management, specific financial responsibilities, including budget preparation involving the allocation of revenues, following preparation of detailed studies by the Mayor, and control over special revenue funds. Because of the nature of the Council's role in the appropriations process for the District government, sharing the allocation role with the electorate would jeopardize the Council's ability to carry out its other Charter responsibilities. Where a legislature has control over both the authorization and the appropriation functions, as in a state, the by-pass interpretation still assures that the same legislative authority is invoked to authorize an activity that is invoked to make the final decision on spending. In the absence of such budget autonomy, however, this is not true. Moreover, the division of controls is complex in

the District of Columbia; as noted during the Council's debate, the procedure for Congressional review of legislation passed by the Council did not assure that the same Congressional committees would review the initiative as would consider its fiscal impact. *See Convention Center II, supra* note 1, 441 A.2d at 931 n. 1.

The deficiency of the by-pass interpretation applied to the District of Columbia is most dramatically illustrated by a hypothetical initiative which would allocate 95 percent of District government revenues to special funds for initiative-designated purposes. The Council's ability to allocate revenues effectively and efficiently is clearly thwarted. The Council would be powerless to use the available revenues other than as the initiative directs, regardless of other demands and requirements. But even a lesser revenue allocation by initiative demonstrates the point: any allocation intrudes on both the discretion of the Council in deciding how to allocate revenues among competing programs and activities, and on the Charter's financial policies, as reflected, most significantly in the instant appeals, by the limit on the establishment of special funds to only those that the Council determines "may be necessary for the efficient operation of the government of the District." D.C.Code § 47–130. The limitation of the number of actors in the local budget process arises, therefore, from the nature of the Council's role in that process; it cannot both share its allocation role and carry out its financial responsibilities, including that for special funds. *Cf. Opinion of the Justices, supra,* 9 N.E.2d at 188 (prohibition of "special appropriations" was "designed to prevent any interference with the general plan [in the state constitution 'to centralize financial affairs ... and responsibility'] by means of initiative"). Thus, the by-pass interpretation adopted in some states fails to address fully the unique nature of the Council's fiscal role.

The third interpretation, adopted by the three-judge plurality in *Convention Center II, supra* note 1, by contrast, addresses the

District government's fiscal uniqueness.[29] It acknowledges the legislative intent to prohibit initiatives that would "launch the appropriations process." 441 A.2d at 912. In the context of the instant appeals such launching would occur when revenues were required to be put in special funds dedicated to specific purposes. The Council's ability to free those revenues for other purposes in a Budget Request Act would require it to repeal the initiative dedicating the revenues. Because the court in *Convention Center II, supra* note 1, did not have occasion to define the nature of "launching the appropriations process," its import was not clear. The needed clarity is provided by the fourth interpretation.[30]

■ The fourth interpretation equates "laws appropriating funds" with laws allocating funds, and thereby fully addresses Congressional intent in the Charter and the Council's intent in limiting the initiative right. It does so in several ways. First, it responds to the Congressional purpose of consolidating local financial responsibility in the District government's elected officials. *See* Part II, *supra.* The restriction on the creation of special funds practically

forces the conclusion that in order for the Council to be in a position to assure sound financial management, it must retain control of decisions on how revenues, new as well as old, should be allocated.[31] Once Congress assigned local financial responsibilities while limiting local fiscal autonomy, it was incumbent upon the Council to assure that deficits would not occur and that District government's revenues would be most effectively and efficiently allocated among competing programs and activities. The Congress and the Council, in approving a right of initiative, accomplished this by allowing a broad right of authorization by initiative but eliminating any allocation right by initiative.

In addition, the language and legislative history of the "laws appropriating funds" limitation do not suggest that some limitations on the Council's allocation role would be valid. The words chosen by the Council in the Charter Amendments Act legislation, to include the "laws appropriating funds" limitation, and the words chosen by the Council in the Initiative Procedures Act, reflect a concern about financial control that is in accord with Congressional expectations for improved financial management

29. The differences in *Convention Center II, supra* note 1, between the plurality and dissenting opinions, the latter viewing the "laws appropriating funds" limitation to prohibit only a Budget Request Act initiative, 441 A.2d at 925, arguably might disappear when the limitation is defined in terms of the function of a Budget Request Act within the Charter's assignment of financial responsibilities. *But see id.*, 441 A.2d at 926 ("the people may, by initiative, authorize a capital project and even direct the Council to request the necessary funding from Congress") (dissenting opinion). Then it is clear that to conclude that an initiative cannot be a Budget Request Act is also to conclude that an initiative cannot interfere with the Council's power to allocate revenues among agencies and authorized programs; otherwise the Council cannot fulfill its other financial responsibilities under the Charter.

30. Indeed, except for dictum in the plurality opinion about future prohibitions, the third and fourth interpretations of the initiative right effectively merge. The three-judge plurality in *Convention Center II* concluded that the limitation that an initiative could not "negate or limit" a budget request act, D.C.Code § 1–1116(k)(7) (1980 Supp.), "manifestly prohibits only initiatives that would contravene an existing budget request act. It does not appear to proscribe

initiatives with a prospective fiscal effect only." 441 A.2d at 914 (referring to Chairman Dixon's comment that "items that have already been acted on by this Council and have gone through the appropriations process"). Viewed in context, the statement about prospective initiatives is interpreting only the "negate or limit" limitation, § 1–1320(b)(1)(D). *See* Part III.C., *supra.* In any event, the statement is dictum since the initiative before the court in *Convention Center II* sought to negate, or deauthorize, an appropriation made by Act of Congress. Moreover, we have no occasion here to address a proposed initiative that would abolish an existing program by directing that in the future no more money shall be committed to it.

31. In accordance with its fiscal responsibilities, the Council has acknowledged that "[t]he number of funds should be kept to a minimum necessary for sound financial administration," and adopted a proposed fund structure for the District government following a study by the Temporary Commission on Financial Oversight of the District of Columbia established by Congress. D.C.Code § 47–371(2) & (9) (1987 Repl.); § 47–372(3) (defining "fund"), § 47–373 (organization of fund structure).

with self government. The reference during the Council's debate on the "laws appropriating funds" limitation that an initiative could include a source of funding is not inconsistent with a determination by the Council to retain full control of the allocation of revenues raised by the initiative. *See* Part III.A., *supra.* As the Chairman of the Council (and author of the "laws appropriating funds" limitation) and the chairman of the Council's Finance Committee stated, an initiative could establish a new tax but not dictate the uses of the taxes thereby collected. Furthermore, since the Council's financial responsibilities under the Charter extend to the determination of when special funds are necessary, see Part II, *supra,* the title IV limitation on the initiative right would prevent the electorate, through the initiative, from interfering with the Council's power to allocate by placing revenues in special funds.

◼ Before the court could conclude that the Congress and the Council intended that the Council would share its power of the purse by granting the electorate the right of initiative, the Charter Amendment would have to be explicit. We have not even found anything in the legislative history to suggest that the Congress or the Council contemplated that the discretion of the District government's elected officials to allocate revenues could be limited by an initiative. So dramatic a revision of the fiscal scheme in the Charter cannot be lightly inferred. Financial mismanagement resulted in the loss of self-government for the District of Columbia in the last century, *see* Act of July 20, 1874, 18 Stat. 116, and Congressional concern in this century about strengthening financial management in the District government prompted the Charter's fiscal scheme. *See id.* Thus, the word "appropriations," when used in connection with the functions of the Mayor and the Council in the District's budget process, refers to the discretionary process by which revenues are identified and allocated among competing programs and activities.[32] Otherwise the improved financial

management envisioned by the financial policies in the Charter would be jeopardized. *See* note 12, *supra.*

◼ Accordingly, we conclude that the allocation interpretation is most consistent with the District government's unique fiscal status. This interpretation equates "laws appropriating funds" with "acts allocating funds" in recognition of the nature of the Council's role in the budget process and its financial responsibilities under the Charter. It thereby balances the right of initiative with the Charter's provisions for sound financial management by the District government's elected officials. While the initiative right is to be liberally construed, if there are clear and compelling limitations, *see Convention Center II, supra* note 1, 441 A.2d at 913 (citations omitted), the right may be limited. Here there are clear limitations. The initiative right must conform to the structure of government established by Congress in the Charter. This means that a measure which would intrude upon the discretion of the Council to allocate District government revenues in the budget process is not a proper subject for initiative. This is true whether or not the initiatives would raise new revenues.

The right of initiative nevertheless remains "broad" under the allocation interpretation. *See* McQuILLAN, *supra* note 25, § 16.51, at 254; 42 Am.Jur.2d *Initiative and Referendum* § 5, at 653 (1969). The initiative right to propose authorizing legislation that the Council could enact is essentially unfettered. In addition, as the Board of Elections noted in the appeal involving the "Housing Now! Act of 1990" initiative, measures may be proper subjects for initiative where the proposal contains a "nonbinding policy statement" that revenues should be allocated for specified purposes. While the Mayor and Councilmembers, like any elected officials, may take a potential risk in allocating initiative-raised revenues for a purpose other than that suggested by

---

**32.** *See* the Rules of Procedure adopted by the D.C. Council in connection with its budget review functions, *e.g.,* D.C.Code § 1–227, art. VII, *supra* note 8; District of Columbia Council Res. 1–2, 1974, D.C.Stat. 138, 146 (1974).

the initiative, the risk is necessarily overshadowed by the financial responsibilities placed by Congress in the District government's elected officials, and the Mayor and Council have acted accordingly.[33] Moreover, there are other avenues available to the electorate to advise the District government's elected officials about community priorities. *See, e.g.,* D.C.Code § 47–304 (requiring public hearings on the proposed Budget Request Act).

To recapitulate: Unless the "laws appropriating funds" limitation on the right of initiative extends beyond Budget Request Acts, the limitation is superfluous. Failure to extend the limitations on the initiative right to the full measure of the Council's role in the District's budget process is incompatible with the Council's financial responsibilities under the Charter. Therefore, the right of initiative cannot extend to the Council's discretion to allocate revenues or to the Council's decision about when it would be necessary for "the efficient operation of the government of the District" to establish a special fund. D.C.Code § 47–130.[34]

### B.

■ The allocation interpretation disposes of Appeal No. 90–680 ("Affordable Housing Act Initiative"), which would create a new trust fund for the deposit of the new revenues. Under the initiative the Council could only use the revenues in the trust fund to increase the supply of housing for low and moderate income families. The effect of the initiative would be to delay or condition the Council's allocation authority, forcing the Council to use those funds in accordance with the initiative rather than in the discretion of the Council to meet District government needs.[35] The electorate, rather than the District government's elected officials, would direct the allocation of District revenues.

The initiative also would run afoul of the provisions of title IV of the Self–Government Act placing fiscal management responsibilities in the Mayor and Council and requiring that the Council establish special funds only when "necessary for the efficient government of the District." D.C.Code § 47–130. The initiative would directly interfere with, by usurping, the Council's responsibility under title IV to make that determination.

■ The allocation interpretation also disposes of Appeal No. 90–809 (Housing Now! Act of 1990) even though that initiative would call for deposit of new revenues in an existing revolving fund, the Housing Production Trust Fund, established by the D.C. Council in 1989. D.C.Code §§ 45–3101 to –3104 (1990).[36] Under the provisions of the Housing Production Trust Fund, among the types of funds that may be

**33.** *See, e.g., Atchison v. District of Columbia, supra* note 2, 585 A.2d at 151–52 (amending overnight shelter initiative).

**34.** It necessarily follows that our decision was flawed in *District of Columbia Bd. of Elections & Ethics v. District of Columbia,* 520 A.2d 671 (D.C.1986), where the court held that an initiative which created an entitlement, enforceable by a private right of action, did not run afoul of the "laws appropriating funds" or other limitations on the right of initiative. The interference with the Council's allocation power results from the fact that by obtaining a money judgment against the District government, a litigant would force the Council to allocate funds to pay the judgment. *Cf. Jones, supra,* 481 A.2d at 460 (automatic increase in unemployment benefits would "compel a prohibited interference with the management of fiscal affairs of the District"). Otherwise, the allocation interpretation of the initiative right is consistent with the prior decisions of the court.

**35.** The interference exists regardless of whether the Council could effectively negate the interference by shifting other funds from housing for low and moderate income purposes and allocating them to other programs and activities. *See* note 2, *supra.* Once the initiative right extends to the creation of special funds, it would be difficult to determine at what point the restriction on the Council's authority to allocate revenues goes too far. In view of Congressional delegation of fiscal responsibilities to the Mayor and Council, the locally elected officials cannot avoid their responsibilities, which remained intact after Congress approved the Charter Amendments Act.

**36.** D.C.Code § 45–3102(c) provides eleven sources of revenue for the Fund, including appropriated funds.

deposited in the Fund are "[f]ee option contributions made by commercial developers under a commercially linked development policy to be established by statute by the Council." D.C.Code § 45–3102(c)(1). It, therefore, could be argued that the Housing Now! Act of 1990 initiative would not run afoul of the limitations on the initiative right since the initiative proposes to deposit new revenues in a Fund established by the Council. However, this argument fails to come to grips with the fact that the initiative would interfere with the Council's allocation power since the Council would have no discretion about the allocation of the new revenues raised by the initiative. Although the Council has authorized such funds to be deposited in the Housing Production Trust Fund, it has not, thereby, relinquished its authority, much less its Charter responsibility, to determine when, if, and how much revenue shall be allocated to the Fund.

Accordingly, the judgments are affirmed.