Aulander STEVENSON,
et al., Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS & ETHICS, et al., Appellees.

Aulander STEVENSON,
et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS & ETHICS,
Respondent,

Joseph McLaughlin, et al., Intervenors.

Nos. 95–CV–1242, 96–CV–2, 96–CV–13, 96–CV–642 and 96–AA–1007.

District of Columbia Court of Appeals.

Argued Sept. 24, 1996.
Decided Oct. 4, 1996.

---

Vincent Mark J. Policy, Washington, DC, for Appellants/Petitioners.

Kenneth J. McGhie, with whom Alice P. McCrory–Miller, General Counsel, and William O. Sanford, Washington, DC, were on the brief, for the District of Columbia Board of Elections & Ethics.

Katherine A. Meyer, with whom Carol R. Golubock was on the brief, Washington, DC, for intervenors.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.

Before SCHWELB, FARRELL, and REID, Associate Judges.

PER CURIAM.

Before us are consolidated appeals from four decisions of the Superior Court together with a petition for review of a decision by the District of Columbia Board of Elections & Ethics. Together they comprise challenges to an initiative petition, No. 51, "The Real Property Assessment and Tax Amendments Act." In previous incarnations, the petition has been before this court three times.[1] Its purpose is to amend the real property tax laws in part to create an Office of Public Advocate for Assessments and Taxation, with authority to appear on behalf of the public in administrative tax assessment proceedings.

Following our invalidation of the petition in *Price, supra* note 1, on the ground that the proponents had not obtained the required number of signatures, the petition was again filed and received its present number. The Board approved the subject matter of the petition, as well as its short title, summary statement, and legislative form. Appellants then challenged the petition in Superior Court on legal grounds, which the court (Judge Linda Turner Hamilton) rejected. Two of those grounds are raised anew on appeal. Meanwhile, the original proponent of the measure, Jay Hessey, had moved to Maryland. Appellants then asked the Board to reject the petition on the ground that Hessey could no longer be a "proposer" of the measure since he was no longer a registered qualified elector. In response, the pro-

ponents requested leave to substitute new "proposers," and the Board, after considering the issue, filed a declaratory judgment action in Superior Court seeking an interpretation of the initiative statute on the substitution issue. The trial court (Judge Stephen F. Eilperin) concluded that substitution is permitted by the statute, and that ruling forms another of the issues on appeal. Independently, appellants filed a petition for review in this court contending that the Board had used unpublished procedures contrary to law in determining whether the petition qualified for the ballot.

We reject each of appellants' arguments on appeal and deny the petition for review.

## I.

Appellants contend that the Charter Amendments Act,[2] insofar as it established the right of initiative in the District of Columbia, is "void" for two reasons: one, the initiative right is beyond the scope of permissible amendments of the District Charter; and two, the initiative provision as enrolled and signed by the Mayor was a different provision from that passed or intended by the Council. Both arguments are, to say the least, audacious. The Charter Amendments have been on the statute books since 1977, have been invoked repeatedly as the basis for initiatives, and have been interpreted and applied by the Board and this court since as long ago as *Convention Ctr. Referendum Comm. v. Bd. of Elections & Ethics,* 399 A.2d 550 (D.C.1979) (*Convention Center I* ). In that time no serious question has been raised about the fundamental conformity of the amendments to the District's Charter or the legitimacy of their original enactment.

Moreover, in substance the present initiative is the same one initially submitted to the Board of Elections in 1990 and previously challenged before the Board, in Superior

---

1. *Hessey v. Burden,* 584 A.2d 1 (D.C.1990) (*Hessey I* ); *Hessey v. Burden,* 615 A.2d 562 (D.C. 1992) (*Hessey II* ); *Price v. District of Columbia Bd. of Elections & Ethics,* 645 A.2d 594 (D.C. 1994).

2. Initiative, Referendum, and Recall Charter Amendments Act of 1977, D.C.Code §§ 1–281 to –295 (1992). The Act amended the District of Columbia Self–Government and Governmental Reorganization Act (the Home Rule Act), Pub.L. No. 93–198, 87 Stat. 774 (1973). Title IV of the Home Rule Act is entitled "The District Charter."

Court, and in this court on no fewer than three occasions. Yet the present claims have not been raised until the instant litigation. Not surprisingly, therefore, the proponents of the initiative now argue *res judicata,* contending that Mr. Stevenson and Ms. White, the present challengers, are stalking horses for and in "privity" with the Apartment and Office Building Association (AOBA), which was a named opponent of the initiative on all three prior occasions. The parties trade citations from our previous decisions dealing with this initiative. The proponents quote our statement in *Hessey II, supra* note 1, that "[t]he door is now closed to further substantive challenges to the initiative itself." 615 A.2d at 581. Appellants, besides vigorously disputing that Ms. White and Mr. Stevenson are *alter egos* of AOBA, point to our conclusion in *Price, supra* note 1 (after we invalidated the initiative on procedural grounds) that " '[Hessey] must commence the [petition] process anew,' " 645 A.2d at 600 (quoting 3 DCMR § 1011.3 (1994)), in turn prompting the trial court in this case to say: "with a new process comes new court challenges." The preclusion issue is a troubling one, because too permissive an attitude by the courts toward belated structural challenges of the sort made here—especially one attacking the very establishment of the initiative right—would legitimately be seen as throwing roadblocks in the way of the public will. *Cf. Dankman v. District of Columbia Bd. of Elections & Ethics,* 443 A.2d 507, 515 (D.C.1981) (en banc) (court's role in reviewing Board decisions is in part to guard against voter "disenfranchise[ment]") (citation omitted). We conclude, however, that it is unnecessary for us to decide the *res judicata* issue,[3] because appellants' contentions fail on the merits.

### A.

In *Convention Ctr. Referendum Comm. v. District of Columbia Bd. of Elec-* tions & Ethics, 441 A.2d 889 (D.C.1981) (en banc) (plurality opinion) (*Convention Center II* ), this court explained that the Charter Amendments Act "granted the electorate ... long-recognized instruments of direct control of legislative decisions and decisionmakers," including the right of initiative. *Id.* at 896. Except where specifically limited, that right is "essentially unfettered." *Hessey v. District of Columbia Bd. of Elections & Ethics,* 601 A.2d 3, 19 (D.C.1991) (en banc).[4] Appellants now contend, nevertheless, that by creating the initiative right the Charter Amendments Act exceeded the scope of allowable amendments under the Charter. Section 303(a) of the Charter, D.C.Code § 1–205(a), was the basis for the amendments. It provides in relevant part:

> The charter set forth in title IV [of the Self–Government Act] (including any provision of law amended by such title), *except §§ 401(a) and 421(a),* and Part C of such title, may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification. [Emphasis added.]

Appellants contend that the initiative transgresses upon sections 401(a) and 421(a) of the Charter.

The plain language of those sections refutes this argument. Section 401(a) states: "There is established a Council of the District of Columbia; and the members of the Council shall be elected by the registered qualified electors of the District." Section 421(a) likewise states: "There is established the Office of Mayor of the District of Columbia; and the Mayor shall be elected by the registered qualified electors of the District." The initiative right neither disestablished— abolished—the Council or the Office of Mayor, nor affected the manner by which the members of the Council or the Mayor are elected. By its nature, of course, the right of citizen-initiated legislation potentially limits

---

3. Our task in doing so would be difficult if not impossible in any case, since the trial judge made no findings with respect to the relationship between challengers Stevenson and White and the former opponents of the initiative, hence on the mixed factual-legal issue of "privity." A remand would be necessary on that point.

4. That *Hessey* decision involved a different initiative proposed by Mr. Hessey unrelated to the one at issue here.

the power of both branches of government.[5] But if Congress had meant to prohibit any such limitation, one would have expected it to specify among the Charter sections not subject to amendment section 404(a), which states that "the legislative power granted to the District by this Act is vested in and shall be exercised by the Council," and section 404(e), which gives the Mayor the power to approve or disapprove an act of the Council. As neither section was put beyond the reach of amendment, the logical inference is that Congress intended no such insulation of those powers against any form of direct control by the electorate. "[W]hen a legislature makes express mention of one thing, the exclusion of others is implied, because 'there is an inference that all omissions shall be understood as exclusions.'" *McCray v. McGee*, 504 A.2d 1128, 1130 (D.C.1986) (quoting 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47.23 (4th ed. 1984)).

Appellants cite from the Joint Explanatory Statement of the Committee of Conference in adopting section 303(a) of the Charter:

(1) Any change from an elected Mayor–Council form of government must be initiated by Congress and approved by the President;

(2) Any other changes in the Charter shall be originated by the Council by act and then shall be referred to a referendum of the citizens of the District of Columbia....

This description of intent is fully consistent with the plain meaning of sections 303(a), 401(a), and 421(a) discussed above. Moreover, denying the Council authority to originate amendments limiting at all its legislative power would be contrary to the general purpose of the Self–Government Act to "relieve Congress of the burden of legislating upon essentially local District matters." Section 102(a), D.C.Code § 1–201(a).[6] Finally, it is not without significance that Congress affir-

matively approved the Charter Amendments Act after passage by the Council. *See Hessey v. District of Columbia Bd. of Elections & Ethics*, 601 A.2d at 7; *see also Winters v. Ridley*, 596 A.2d 569 (D.C.1991) (per curiam).

In sum, we reject the argument that adoption of the initiative right by the Council, Mayor, and electorate violated the District's Charter.

### B.

█ Appellants further argue that the provision of the Charter Amendments Act creating the initiative right is void because that provision, as signed by the Mayor, was not the bill which the Council passed. Appellants thus rely on the principle that when the legislature has passed one bill and the governor (or in this case the Mayor) has signed a different version of it, the bill never becomes law and is void for failure to follow essential prerequisites to enactment. *See, e.g., Kenyon v. Kansas Power & Light Co.*, 254 Kan. 287, 864 P.2d 1161, 1163–64 (1993).

Appellants' argument is not really that the Council *passed* one bill and the Mayor (then-Mayor Washington) signed another. They acknowledge that the enrolled legislation[7] transmitted to the Mayor for signature was the very same act he signed. Appellants' argument in substance is that the act signed by the Mayor did not contain the initiative provision which the Council *intended* to pass. As enacted and signed by the Mayor, the section creating the initiative right stated as follows:

Sec. 2. Process

(a) An initiative or referendum may be proposed by the presentation of a petition to the District of Columbia Board of Elections and Ethics containing the signatures of registered qualified electors equal in number to five (5) percent of the registered electors in the District of Columbia:

---

5. At the same time, the Council may repeal or amend any legislation brought about by initiative. . *See, e.g., Atchison v. District of Columbia*, 585 A.2d 150, 155 (D.C.1991).

6. As intervenors and the District of Columbia point out, the legislative history reveals that Congress's concern was with an original, House-sponsored version of the Self–Government Act

that would have allowed amendments to the *Charter* by initiative, something very different from use of the right to pass ordinary legislation.

7. An "enrolled" bill is "[t]he final copy of a bill ... which has passed both houses of a [bicameral] legislature and is ready for signature." BLACK'S LAW DICTIONARY 530 (6th ed. 1990).

PROVIDED, That the total signatures submitted included five (5) percent of the registered electors *in five (5) or more of the City's wards.* [Emphasis added.]

Appellants assert that what the Council meant to enact was a different law, one that in place of the italicized words would have said: "in *each of* five (5) or more of the City's wards" (emphasis added). No one disputes that this is in fact what the Council intended. Indeed, much of the parties' dispute is over the efficacy of the Council's later steps to amend the statute once it recognized what seems to have been a typographical error. The defect in appellants' argument, however, is its premise that the bill as enacted meant something different from the bill the Council intended. Normal principles of statutory construction tell us that it did not.

"The text of an enactment is the primary source for determining its drafters' intent." *Convention Center I,* 399 A.2d at 552. The text of the enacted law is unmistakably ambiguous. The signatory requirement of "five (5) percent of the registered electors in five (5) or more of the City's wards" could mean the aggregate of electors in five or more wards (in which case the percentage in any one or even four wards could be under five percent), or it could mean the electors in each of five or more wards, requiring a more widespread distribution. Neither reading is compelled or even favored by the disputed words. Since no other language of the act nor its structure illuminates the issue, we accordingly must look elsewhere. When "the statutory language is ambiguous or otherwise unclear, we look to the legislative history for guidance in interpreting it." *In re W.L.,* 603 A.2d 839, 842 (D.C.1991). "[T]he less plain the statutory language is, the more likely the focus on legislative intent or statutory purpose will be determinative." *In re M.M.D.,* 662 A.2d 837, 855 (D.C.1995). Here, as all parties concede, the legislative history both at the time of enactment and afterwards (upon discovery of the error by the Council) points unmistakably to the Council's intent: it meant "in each of" five or more wards. Thus, the act signed by the Mayor, since it is ambiguous on the point in question, must be read as expressing that intent.

Appellants point to a statement by the sponsor of corrective legislation that the enrolled bill had "completely change[d] the sense of the bill we passed." But it is the function of courts, not the legislature, to decide whether a statute is ambiguous, just as courts and not the parties decide whether a contract on its face is ambiguous. *See Sacks v. Rothberg,* 569 A.2d 150, 154 (D.C.1990). Moreover, in proceeding first by emergency legislation then by permanent legislation to reinsert the words "each of," the Council did no more than clarify the statute after recognizing the ambiguity in the law as enacted. Appellants' argument that the permanent legislation was ineffective because the Charter cannot be amended by ordinary legislation, D.C.Code § 1–205(a), thus collapses with its premise that the amendment meant something different from the language originally enacted.

## II.

On September 11, 1995, following a trial court ruling rejecting the opponents' contentions discussed in Part I of this opinion, the Board held a meeting to consider the proponents' request that Initiative No. 51 be approved for inclusion on the ballot. At this meeting, the opponents demanded that the Board discontinue processing the measure because its "proposer," Jay Hessey, had recently moved to Takoma Park, Maryland. They contended that Hessey no longer qualified as a proposer, and that any new proposer must begin the process anew.

The District's election law provides that a proposed initiative measure shall be accompanied by "[a]n affidavit that the proposer is a registered qualified elector of the District of Columbia." D.C.Code § 1–1320(a)(2)(B). Hessey argued that he had been a qualified elector both when he first filed the measure with the Board in 1990 and when he resubmitted it in 1994 following this court's decision in *Price.* He contended that the statute required no more. Hessey suggested that two other supporters of the measure who were qualified electors, Joseph McLaughlin and Emanuel Pastreich, be designated to serve as additional or substitute proposers.

The Board concluded that it lacked the authority to continue to process Initiative No. 51 with Hessey, a non-resident of the District, as the sole proposer. On October 20, 1995, in an attempt to obtain a prompt resolution of the question whether additional proposers could lawfully be designated at this stage of the process, the Board filed an action for a declaratory judgment in the Superior Court. Mr. Hessey, as a proponent of the measure, and Ms. White and Mr. Stevenson, as opponents, were named as defendants.

On December 22, 1995, after receiving the parties' submissions and hearing oral argument, Judge Stephen F. Eilperin granted Hessey's motion for summary judgment. Judge Eilperin analyzed the issue as follows:

> The Court finds that a registered qualified elector is required to participate in the initiative process during all stages of the procedure in which a "proposer" is statutorily commanded to play a participatory role. Although the statute is not a model of clarity, requiring at least one registered qualified elector to shepherd the initiative along not only advances the legislative scheme, but ensures that all proposed initiative measures are actually proposed and supported by a bona fide member of the D.C. electorate.

> However, it is not necessary that a *particular* registered qualified elector remain the singular official proposer for the entire process. Nothing in the text of the statute or its overall plan limits the proposer to the initial filer of the initiative. D.C.Code § 1–1301 *et seq.* Indeed, the statute's definitional section is more suggestive of a broad reading since "proposer" is defined to mean "one *or more* of the registered qualified electors of the District of Columbia...." D.C.Code § 1–1302(15) (emphasis added).

> Although the statutory initiative scheme does not detail any specific procedure for substitution and/or addition of new proposers, the Board has general rulemaking power, *see* D.C.Code § 1–1306(a)(14), and there is no reason to think that the Board of Elections could not design an appropriate method for substitution. The proce-

dure for designating the original proposer is notably cursory and limited in its inquiry. All that is required is the filing of the proposer's name and address and an affidavit that he/she is a registered qualified elector. Procedures for designating new or additional proposers to be added or substituted should not prove unduly complicated. As a franchise right, the initiative right should be liberally construed in both substantive and procedural contexts so as to advance and favor franchise. *Convention Center Referendum Committee v. D.C. Board of Elections,* 441 A.2d 871, 883 (D.C.1980), on rehearing, 441 A.2d 889, 913 (D.C.1981); *Lawrence v. Board of Elections,* 611 A.2d 529 (D.C.1992), *quoting Kamins v. Board of Elections,* 324 A.2d 187, 192 (D.C.1974). It would be a cr[a]bbed reading of the statute to preclude substitution of proposers.

> No prejudice is imposed upon opponents of the measure by the simple substitution of one proposer for another. The job of proposer (once the initial filing is submitted) is essentially ministerial and independent of any personal characteristics of the individual occupying it. Furthermore, all challenges—both substantive and procedural—available to opponents of the initiative would remain intact and unaffected by the change of official proposer. [Emphasis in original].

The judge ordered that once a duly qualified proposer had filed the necessary affidavit, the Board was to "proceed to complete the processing of Initiative No. 51 as expeditiously as possible."

We agree with the judge's disposition. Assuming, without deciding, that a proposer must continue to be a resident of the District and a qualified elector throughout the process, rather than merely at the time that he or she initially submits the proposed Initiative to the Board, we do not believe that the statute can reasonably be construed to require the Board to begin the process all over again when a qualified elector is available to substitute for the proposer who moved away. In the absence of a plausible showing of

prejudice,[8] the construction of the statute for which the opponents contend would place unwarranted and disfavored impediments on the right to vote, and it would do so for purely technical reasons not affecting the merits of the issue. *Cf. Harvey v. District of Columbia Bd. of Elections & Ethics,* 581 A.2d 757, 758 n. 3 (D.C.1990) and authorities there cited.

■ The opponents contend that Judge Eilperin exceeded his authority when he issued his order[9] because, according to them, the Board is "expressly empowered to interpret the initiative statutes in the first instance." In support of this supposedly pre-clusive proposition, they cite two statutes which do no more than authorize the Board to issue regulations "to effect the provisions of this subchapter." *See* D.C.Code §§ 1–1324, –1306(a)(14).

We are unpersuaded that the judge was intruding upon the authority of the Board when he responded affirmatively to the Board's request that he perform the quintessentially judicial task of construing a statute. *See Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 177, 2 L.Ed. 60 (1803); *Harris v. District of Columbia Office of Worker's Compensation,* 660 A.2d 404, 407 (D.C.1995). Although courts accord weight to the reasonable construction of a statute by the agency which administers it, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984), the opponents have cited no authority, and we know of none, suggesting that the court must stay its hand where, in order to expedite a process implicating the right to vote, the agency has expressly requested the court for a declaratory judgment. This case does not present the sort of intrusion into the agency's authority condemned by decisions such as *Drayton v. Poretsky Management, Inc.,* 462 A.2d 1115, 1119 (D.C.1983), on which the opponents rely.

Moreover, the Board is in agreement with the trial court's decision and has filed a motion for summary affirmance. This court now having construed the statute as authorizing the substitution of proposers, and the Board having indicated its acceptance of that result, it would be patently futile, at this stage of the proceeding, to remand the case to the Board for its interpretation of the statute. "The law does not require the doing of a futile act," *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), particularly where, as here, the proposed remand would result in further delay and might frustrate the opportunity of the citizens of the District to vote on the issues raised by Initiative No. 51.

## III.

■ Appellants argue that the certification order must be reversed because the Board's internal manual, Standard Procedures for Verification of Initiative Petitions, was not published for notice and comment rule making under the District of Columbia Administrative Procedure Act, D.C.Code § 1–1501 *et seq.* (1992). This argument has no merit. The Board has published rules pertaining to the initiative process. They are codified at 3 DCMR Chapter 10 (1994). The verification sections of these regulations are contained in 3 DCMR § 1007. The standard verification procedures manual does not contain "rules" within the meaning of D.C.Code § 1–1502(6).[10] Rather, the manual is no more

---

8. When asked how the opponents would be prejudiced if new proposers were permitted to participate in the process, counsel for the opponents responded in substance that the public-spirited work done by Ms. White and Mr. Stevenson in opposition to Initiative No. 51 would go for naught. We do not believe that such "prejudice" is legally cognizable, and it certainly does not justify denying to the thousands of qualified voters who have asked that the measure be placed on the ballot the opportunity to have the electorate at large vote it up or down.

9. The opponents have also appealed from a second order by Judge Eilperin, dated May 6, 1996, in which he denied, as "wholly without merit," a challenge to the Board's issuance of regulations pursuant to his December 22, 1995 order. We discern no error.

10. D.C.Code § 1–1502(6) provides: "The term 'rule' means the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy

than a step by step guideline, earmarked for Board employees or others who implement the initiative verification rules.[11]

The Board's standard verification procedures manual does not contain any "policy decision affecting the general public." *Acheson v. Sheaffer*, 520 A.2d 318, 321 (D.C.1987). The contents simply are not "statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *See* D.C.Code § 1–1502(6). Nor are they the type of procedure required to be published by D.C.Code § 1–1503 which mandates publication of agency procedures.[12] To the extent that procedures are required to be promulgated for the initiative process, they are codified in 3 DCMR Chapter 10. As we said in *Acheson*, " 'Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule.' " *Id.* (quoting *SEC v. Chenery*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)).[13]

We conclude that the Board's standard verification manual was not subject to the rule making requirement of the Administrative Procedure Act. The Board duly promulgated regulations relating to policies pertaining to the initiative process, including verification policies, and its standard verification procedures manual is nothing more than a step by step guideline for Board employees or others.

or to describe the organization, procedure, or practice requirements of the Mayor or of any agency."

11. For example, under section one pertaining to receipt of the petition, the employee is told as step one, to "(a) [c]ount the number of pages submitted by the proponent; and (b) [i]ssue a receipt for number of pages actually submitted." Similarly, under section two, concerning the circulator's registration verification, the employee is advised as step one to "(a) [s]ee if the circulator of the petition is a registered voter at the address listed; and (b) [i]f 'yes', write the voter registration number and the date of registration (in RED INK) next to the circulator's name on the petition."

12. D.C.Code § 1–1503 (1992) provides in part:

(b) Each independent agency shall establish procedures in accordance with this subchapter.

Accordingly, the judgments of the Superior Court are affirmed; and the petition for review is denied. The mandate shall issue forthwith.

*So ordered.*

(c) The procedures required to be established by [subsection] ... (b) of this section shall include requirements of practice before ... each agency.

13. This case is not analogous to *District of Columbia v. Green*, 310 A.2d 848 (D.C.1973), on which appellants rely. There this court held that an interpretation of the words "full and true value" as they related to the assessment of real property constituted a "rule." Clearly that interpretation constituted a policy decision affecting the general public. *Webb v. District of Columbia Dep't of Human Servs.*, 618 A.2d 148 (D.C.1992), also cited by appellants, is equally inapplicable. That case involved policies concerning eligibility for homemaker's benefits under Title XX of the Social Security Act, 42 U.S.C. § 1397 *et seq.* (1992). The District's policy regarding termination of homemaker benefits was one of "general or particular applicability and future effect" and should have been issued through the rule making process. *See* D.C.Code § 1–1502(6).